The CITY OF BEAUMONT and
Southwestern Bell Telephone
Company, Appellants,

v.

EXCAVATORS & CONSTRUCTORS,
INC., Appellee.

No. 09–92–029 CV.

Court of Appeals of Texas,
Beaumont.

Dec. 16, 1993.

Rehearing Overruled Feb. 3, 1994.

Dissenting Opinion of
Justice Burgess Feb. 10, 1994.

Tyrone Cooper, Asst. City Atty., Bruce W. Cobb, Beaumont, Deborah Heaton McElvaney, Dillard, McElvaney & Kovach, Houston, Cheryl D. Oleson, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, for appellants.

Robert Scott, Goforth, Lewis, Scott & Williams, Houston, Thomas W. Duesler, Adams, Coffey & Duesler, L.L.P., Wm. E. Heaner, Jr., Gulf State Utilities Co., Beaumont, Clint W. Lewis, Lewis and Henry, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

In March of 1988, Excavators & Constructors, Inc., (Excavators) filed suit against The City of Beaumont (City), Southwestern Bell Telephone Company (Bell), Gulf States Utilities, Inc. (GSU), Fittz & Shipman, Inc. (Fittz), and Liberty T.V. Cable, Inc. (Cable), for inefficiency and delay damages allegedly suffered by Excavators in the performance of a contract it had entered into with the City. Excavators settled with several of the entities prior to trial. Trial was had before a jury, and the jury found in favor of Excavators as against the City and Bell. Judgment was entered in favor of Excavators and it ordered the City to pay Excavators' damages and also ordered Bell to partially indemnify the City under Ordinance No. 85–50. From that judgment this appeal ensued.

### The Basic Contract and its Provision for 220 Working Days and 240 Working Days for Final Completion

Excavators and City agreed to a written contract on April 8, 1986, for nearly one million dollars to be paid and awarded to Excavators; Excavators was to provide street widening and other improvements to Highland Avenue, a street in the City. The widening and the improvements were *to be substantially completed within 220 working days and finally completed within 240 working days.* On April 8, 1986, Bell was not a party to the contract—it never was a signatory to Excavators' contract. Bell had no contractual relation with Excavators and the telephone company was not advised that the contract had been actually awarded and executed until Bell received a notice in April of a certain preconstruction meeting (the preconstruction meeting). Query: Were the 220 working days available and salutary to the City? Query: Could not the City look to the 220 days in scheduling the City's work? From the wording of the contract we think the answer is *yes* to each query. Nothing in the basic contract authorizes Excavators to accelerate the work on the project.

The record reflects that Excavators completed its contract on the project within the allotted days. Excavators was assessed no penalty or other types of damages for untimely completion. The evidence clearly shows that Excavators made a 16.7 percent profit on the project, being about $168,000. Bell's contentions are that Excavators finished the project within the contractually allotted time and made the profit that it intended to make. It was demonstrated that no loss or opportunity to bid or perform other work on any other contract existed. Excavators lost no other work.

### Excavators' Position and Contentions vis-à-vis Bell

Excavators brought a legal proceeding alleging that it was delayed in the performance of its excavation and improvement work by Bell's delay in relocating its telephone poles. Excavators alleged it suffered damage as a result of the resequencing by Bell. Excavators claimed it suffered inefficiencies due to Bell's delays in resequencing work. These inefficiencies were caused because Excavators contended it had to relocate and reassign its own equipment and its crews of working men. Excavators claimed damages for equipment rental charges and labor costs. These costs generally and very substantially occurred within six months from and after the preconstruction meeting.

### The Thomason Enterprises Question

Excavators contended-for increased costs were associated with certain alleged ineffi-

ciencies which were caused in this case *by Excavators own workmen and own working crews that were performing work that Excavators had previously subcontracted out to Thomason Enterprises (Thomason work).* Relevant to this matter Excavators claimed that because of the delays forced upon it in its contract work, it was necessary to have its own employees perform the Thomason work so that Excavators would not have to lay off its employees and thereby allegedly run a risk that their own employees would be hired by another contracting firm. Nevertheless, Excavators affirmatively claimed that its own crew did not perform this previously subcontracted work as efficiently as Thomason would have and that such inefficiencies damaged Excavators in the alleged amount of about $102,785. The Thomason work issue resulted from the sole decision of Excavators. Not only did Excavators increase its cost and its alleged damages, it failed to mitigate its costs and damages. *Thus, Excavators damaged Excavators.*

Evidence coming from a superintendent for Thomason showed that Excavators chose to perform the Thomason work *simply because it was high profit work* and that *Excavators performed the work as efficiently as Thomason could have.* Furthermore, this superintendent testified that Excavators often performed Thomason work when profitable to do so.

### The City of Beaumont's Point of Error No. 1 and Reply Point of Excavators

The City's point number one contends that the trial court erred in overruling the City's motion for judgment non obstante veredicto as the "no damage for delay" clause, contained in the basic construction contract between the City and Excavators, precluded recovery for delays or inefficiency damages.

### Excavators Duty and Responsibility to Inspect the Work Site

The construction contract itself provided that the contractor would inspect the route of the construction *during the bidding period and check that location for utilities and a possibility of any conflicts and problems as* well as the addition of new utilities. Whenever any existing utilities presented obstructions to the work, then the contractor (Excavators) would notify the professional engineer on the job. When necessary to move any services, poles, guywires, pipelines or other obstructions, Excavators had the initial duty to make the necessary arrangements with the owners and operators of the utilities. We conclude the language of the contract and this duty put the contractor on notice that all of the changes involved would have to be made during the progress of the work— since Excavators insisted upon beginning the work immediately. Hence, Excavators should have known that there would be delays. And clearly, the construction contract provides that the owner (City) will not be liable for damage on account of delays due to changes made by the owner-operator of the utility involved which hindered progress of the work. *Nor will the owner be liable for costs incurred by the contractor due to relocating utility service poles, services, and appurtenances.*

### The "No Damage for Delay" Clause

The term "owner" or "owner-operator" in the contract means the City, but the broad language used as to the owner-operator of utility poles would evidently refer to other utility owners and operators. Hence, certain issues are of paramount importance in this appeal. One, does the "no damage for delay" clause become implicated and viable under this record? Two, does the "no damage for delay" clause preclude Excavators (or rather recovery by Excavators) for loss of any inefficiency or delay damages? As usually construed, the so-called "no damage for delay" clause essentially denies the contractor the right to recover damages for delays of others in the performance of a construction contract. *See,* Maurice T. Brunner, Annotation, *Validity and Construction of "No Damage" Clause with Respect to Delay in Building or Construction Contract,* 74 A.L.R.3rd 187, 197–200 (1976).

In Texas, similar provisions in construction contracts have been given effect by the courts. *See City of Houston v. R.F. Ball Const. Co., Inc.,* 570 S.W.2d 75, 77 (Tex.Civ.

App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.). The wording of the clause makes obvious its purpose and intent which is to exculpate the City from liability for damages due to any delay from: (1) "changes made by the owner-operator of the utility which hinder the progress of work", or (2) "incurred in relocating utility services, poles, services, and appurtenances."

■ It is not disputed that the contract between Excavators and City contains a valid no damage clause. In fact, Excavators put that contract in its entirety into evidence. The crucial question is whether the clause applies in such a manner as to defeat Excavators' recovery of delay or loss of efficiency damages. There is a practical and pragmatic reason for "no damage for delay" clauses to be incorporated in such construction contracts. In this case and under this record, the parties actually had knowledge and foresaw the possibilities of delays. The language of the contract itself stated: "It is contemplated that the removal of existing utilities in the construction area will be accomplished during the work of this contract." It is obvious that the parties to the contract and especially Excavators actually contemplated delays under the contract since the work was to be done under the existing circumstances. Again, Excavators elected to start work at once, thereby breaching a scope of the work provision. The record reflects that Excavators had plenty of time and ample opportunity (at bidding time) to go to the area on Highland Avenue to inspect and perform a full reconnoiter of the proposed job area. In fact, the contract required Excavators to inspect the route and area of construction during the bidding period and to check the location of utilities; the possibilities of any conflicts, problems, and obstructions. Indeed, certain utilities had been relocated by the City during the work on a previous contract and a prior job that was performed by Excavators at a different site.

Reply point number one and the City's point number one argue and challenge this issue of "no damage for delay."

City contends that the very language of the contract simply disallows damages for delays or damages for inefficiencies caused by owners or operators of utilities. Excavators refutes this and counters by arguing that the damages for delays do not apply to damages that were allegedly sustained by Excavators in this case.

Excavators argues that: (1) the no damage clause simply does not apply to Excavators here because this clause applies only to underground work and construction; and (2) the contract provides for damages for work delayed or hindered by the City if the Excavators suffered actual damages and if the contractee, that is, the City, was responsible for the cost caused by the delays.

### Bell's Point of Error No. 1 and the No Legal Duty Defense

■ Bell takes the adamant, uncompromising position that it (Bell) owed and owes no legal duty to Excavators. Bell maintains that it and Excavators were and are total, *legal strangers*. Bell claims that no duty whatsoever existed that was owed by Bell to Excavators. The record is clear that there is a total absence of any contract between Bell and Excavators. Hence, there can be no duty arising out of a ordinary contract. Bell argues that no common-law duty exists and no common-law duty is imposed upon it. Furthermore, Bell argues that the question of duty is strictly a question of law for the trial court or the appellate court to decide. *See and compare Fort Bend County Drainage D. v. Sbrusch*, 818 S.W.2d 392 (Tex.1991); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523 (Tex.1990).

Bell maintains that in determining the legal question of duty it becomes necessary that the trial court and this intermediate Court discern and define some definite relationship between the parties which is of such a character and quality that social policy justifies the imposition of a duty. The determination of a social policy which justifies the creation of a duty is not an easy exercise. *See and compare* William W. Kilgarlin & Sandra Sterba–Boatwright, *The Recent Evolution of Duty in Texas*, 28 S.Tex.L.Rev. 241 (1986).

Bell insists that in an analysis of social policy and the related duty, a court must

consider a number of interrelated, intermingled, and interdependent factors. These factors include the risk involved, foreseeability, the likelihood or probability of injury or damages. All of these are to be weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden upon an actor-defendant. *See and compare Greater Houston Transp. Co. v. Phillips, supra,* 801 S.W.2d at 525.

Foreseeability has been characterized as the foremost and dominant consideration—the principle factor. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Bell argues somewhat persuasively that it had no contract and no special relationship with Excavators; and hence, no duty to relocate its utilities in the road-widening project *within a predetermined timing and sequencing schedule orchestrated by and for the convenience of Excavators.* Bell places important reliance on *Fort Bend County Drainage D. v. Sbrusch, supra,* wherein Bell contends that the Texas Supreme Court was presented with a closely similar fact situation and scenario and wherein the High Court declined to impose a duty. Bell analyzes the *Fort Bend County Drainage* case as one in which the district had entered into an easement contract with the owner of a certain bridge. The bridge later collapsed causing injury to a third party. *See and compare Southwestern Bell v. John Carlo Texas,* 843 S.W.2d 470 (Tex.1992).

### The Policy Question of Creating and Imposing a Duty on Bell

Southwestern Bell throws down its gauntlet to us in this fashion:

If this court affirms the trial court's Judgment, it will condone a legal act having no basis in the law, *to wit,* it will artificially carve out of this factual scenario a duty, unique to Southwestern Bell and other utilities companies, to insure against all unforeseen harm to third-party *strangers.* No other court has chosen to so cavalierly disrupt the delicate balancing of critical factors: the overriding social and economic needs of those with whom Southwestern Bell has a contractual and/or a special relationships, *i.e.,* its customers and the public, balanced against the singular interests of a *stranger.* Accordingly, this court [the Ninth Court] must correct the egregious wrong perpetrated by the trial court, embrace the concept of *stare decisis,* and render that Southwestern Bell, as a matter of law, owed no legal duty to Excavators, a *legal stranger.* (emphasis theirs)

In sum, Bell argues that it owed a legal duty solely and alone to the public, its customers, and to the City of Beaumont. No other duty existed. It is correct (as is contended by Bell) that there was no privity of contract or no direct, contractual relationship between Bell and Excavators. The formal contract made the basis of this litigation existed between Excavators and the City and no other party. That contract governed this street-widening project. Bell concedes that it did have a relationship with the City but argues that there were no contract terms or provisions or any other duties or obligations whereby Bell agreed to relocate its facilities in the time frame and sequence that was orchestrated by Excavators. We agree. Bell refers to a black-letter, axiomatic rule *that a contract between other parties cannot create an obligation or duty on a non-contracting party, which non-contracting party was a stranger to the basic, underlying construction contract. See Bernard–Johnson v. Continental Constructors,* 630 S.W.2d 365 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

■ Bell argues that since there was no contractual duty, the courts must invent and conjure up and discover some other type of legal duty that would force Bell to relocate its facilities for the convenience and heightened profits of Excavators despite a potential detriment or real detriment to Bell and in turn to Bell's telephone customers. Bell argues our Court would have to ordain a new and novel duty. *See and compare El Chico Corp., supra.* Bell, in essence, denies any such reasonable foreseeability of any risk of harm. We agree that Bell could not have reasonably foreseen a risk of harm at the time of the utterances or "iffy" future predictions made at the preconstruction meeting. We do not think that Bell's representative, Scott Dillard, spoke in a negligent or deceit-

ful or fraudulent or misleading manner at the preconstruction meeting—more on this issue below. Dillard did not negligently misrepresent future events.

Bell argues, in addition, that it could not anticipate that Excavators would rely upon the timing or the sequencing utterances made by Bell at the preconstruction meeting. We agree. These utterances dealt with future actions which were contingent on weather, rain, and the performance of several third parties. Excavators was in quite a hurry to get out on the job and get started. The record reflects that Excavators stated unequivocally that it could have started the work a month prior to the preconstruction meeting. Bell sums up its argument along these lines: that for this intermediate court to impose a duty where there is no contractual relationship and no common-law theory and no statutory foundation and no familial relationship, then such duty would create an undue, unreasonable and oppressive burden mandating and requiring Bell to focus all of its energies on a contractor's road-widening project so that it could make its bid profit and much more, while simultaneously depriving Bell's telephone customers and the public of their legal rights. Admittedly, the arguments and rationales advanced by Bell are appealing pertaining to "no legal duty". The City makes the notable contention that the "no damage for delay" clause is a complete defense to Excavators' suit.

### The Record and the Applicability Thereunder of the "No Damage for Delay" Clause

■ Both parties, the City and Excavators cite the clause contained in Item 600.07 of the contract. This clause has been and will continue to be referred to as the "no damage" clause. Excavators insists that this "no damage" clause applies only to underground construction and underground work. This clause it says is not involved in this case. We disagree. The record proves otherwise.

Under the heading of "Governing Specifications and Special Provisions", there is an Item 600 entitled "Specifications for Underground Construction of Water and Sewer Pipes." Item 600.01 describes underground

constructions of water and sewer pipes. It, in relevant part, includes preparation of site, clearing, grubbing, excavation, street surface removal, boring, tunneling, dewatering, laying and joining pipe, bedding, back-filling, installation of fittings and manholes, testing and cleaning up of the site and other work. This Item 600 is not to be mistaken with (but makes specific reference to) Item 121 dealing with underground pipe construction which also deals with the street construction specifications of the City. In another part of the basic contract there is a section entitled "General Conditions". Under this section, Article 4 sets out the availability of lands, physical conditions and reference points. Article 4 mandates that the City shall furnish the lands upon which the work is to be performed, rights-of-way and easements for access thereto and other lands which are designated for the use of contractor, being Excavators. Thus, there exists no such duty on Bell.

Query: If the "no damage" clause did not apply to this project why was it in the basic contract; why did the plaintiff introduce the entire contract into evidence and how are the various references to underground construction explained? In other words, if the work done by Excavators strictly had nothing to do with any underground construction, why was this clause put into the basic contract which was agreed to by Excavators and the City? Such an important part of the contract, that is, the "no damage" clause, was obviously within the contemplation of the parties and there logically were intentions on the part of the parties to recognize it as an integral part of the basic contract.

Important work done by Excavators was underground construction. The language spelled out in Item 600.01 defined underground construction. We think various clauses, phrases, provisions, and paragraphs of the contract are ambiguous; and if not ambiguous, they are inconsistent with each other. But the record reflects *that under the contract the "no damage" clause stated that the owner (City) will not be liable for damages on account of delays due to changes made by the owner-operator (City). This clause applies to underground construction,*

*but not exclusively to underground construction.* Importantly, the underground construction, under this record, caused delays in the surface work. Damagewise, these delays were intertwined and intermingled. The delays caused by underground construction were not separable from the other delays. Certainly, Excavators' expert on damages did not separate them. Thus, the "no damage" clause applies in this case.

There is an additional, independent clause in the basic contract providing this: "nor will the OWNER [City] be liable for cost [sic] incurred in relocating utilities service poles, services and appurtenances." This independent clause absolves the owner of utilities from liability of costs and damages occurring in relocating utilities and service poles. Moreover, Item 600.01 is harmonious and is to be read with Item 600.07, making doubly applicable the "no damage" clause.

Excavators takes the position that the "no damage" clause of the basic contract simply does not apply to it but, this clause does not make such a limitation. Excavators further argues that the "no damage" clause is applicable only to underground construction and that its road work was not underground construction. But, the point that Excavators misses is that if underground construction as defined causes delays, inefficiencies, or hinders the surface work, then the owner or operator of utilities simply is not liable for such damages. Excavators has failed to prove a separation of the resulting confluent damages.

The contract had an overall performance bond in the amount of $973,701.50. There were two bonds in the record, one for performance and one for payment, both of which were in identical amounts. The scope of the work clearly includes storm sewers and water line improvements. The scope of the work refers to storm sewer improvements. These improvements consist of extending inlet leads and building new inlets *and even the construction of a new storm sewer system.* Storm sewers are underground construction. The water line improvements consisted of replacing a six-inch, cast iron water line with a larger, eight-inch, asbestos cement water line. This eight-inch line was underground.

Excavators fails to observe that when necessary to move any services, poles, guylines, pipelines, or other obstructions, the contractor was obligated to make the necessary arrangements with the owner-operator of the utilities. The general conditions of the contract specifically provide that the contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures of the construction, including notice to the utilities of any problems. The contractor had the duty to make adequate planning and preparation before excavations started. Item 600.02 entitled "Sequence of Work" so mandates.

### *Testimony of William Schwartzkopf, Excavators' Expert, on Damages*

█ The plaintiff, Excavators, offered an expert, one William Schwartzkopf. He testified that Excavators total damages amounted to $230,721. This exact amount was awarded by the jury. This total sum resulted from all the delays and all inefficiencies by all participants and parties on the job. Schwartzkopf freely admitted upon cross examination that he could not give the jury a total number of days that Excavators had been delayed. *This expert also admitted that he had not done a causation study. He gave no opinion as to causation as to what delay, if any, caused what damage. He gave no opinion as to what party or defendant caused what damage.* He conducted no study as to an allocation of the damages between the City and Bell. He gave no allocation of the damages between the numerous parties.

█ The plaintiff had the burden of proving that the delays and hindrances (and the events connected therewith) that were sued upon actually caused the plaintiff's money damages. That burden is an essential element of Excavators cause of action and the amount of resulting damages must be shown. The causal nexus as well as the amount of damages must be demonstrated by competent evidence. In *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex.1984), the Court held:

Whether the event sued upon caused any injuries to the plaintiff is another matter entirely. The causal nexus between the event sued upon and the plaintiff's injuries is strictly referable to the damages portion of the plaintiff's cause of action. Even if the defendant's liability has been established, proof of this causal nexus is necessary to ascertain the amount of damages to which the plaintiff is entitled.... Proving that the event sued upon caused the plaintiff's alleged injuries is part and parcel of proving the amount of damages to which the plaintiff is entitled. The causal nexus between the event sued upon and the plaintiff's injuries must be shown by competent evidence.

Furthermore, the plaintiff in an alleged breach of a construction contract *must show the nature and extent of the various delays for which damages are claimed.* Plaintiff must *show and connect these delays and hindrances to some act of omission or commission or breach on the individual defendant's part. The damages, if any, caused by each defendant must be proved. See Wunderlich Contracting Company v. United States,* 351 F.2d 956, 173 Ct.Cl. 180 (1965).

Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation, and resultant injury. [citations omitted] It was plaintiffs' obligation in the case at bar to prove with reasonable certainty the extent of unreasonable delay which resulted from defendant's actions and to provide a basis for making a reasonably correct approximation of the damages which arose therefrom. [citations omitted] Broad generalities and inferences to the effect that defendants *must* have caused some delay and damage because the contract took 318 days longer to complete than anticipated are not sufficient. (emphasis theirs)

*Id.* 351 F.2d at 968. Excavators failed to prove such necessary approximations.

■ The burden rests upon the contractor to establish by competent evidence the duration of the delay, the fact of such delay, and that there was no greater fault of the contractor involved, and that there was a causal relationship between such delay and the necessity and reasonableness of additional actual cost. *J.D. Hedin Construction Company v. United States,* 347 F.2d 235, 171 Ct.Cl. 70 (1965), held:

It is well settled that the government is relieved of liability irrespective of its faulty specifications, where the actual delays were occasioned by factors outside the government's control.

. . . .

It is well settled that where delays are occasioned by factors beyond the control of the contractor or the government, a contractor cannot recover damages from the government for the delays, nor can the government properly assess liquidated damages against the contractor.

This holding and its rationale are uniquely applicable to this appeal.

*We must stress the fact that Schwartzkopf admitted that he could have formulated an opinion as to causation; and he could have formed an opinion allocating the damages against each individual defendant. He unequivocally stated that he had not been asked to make the necessary calculations. Excavators had not authorized this necessary work study.*

■ Schwartzkopf had been contacted about a year before trial to become engaged in this litigation by Excavators. He stated that his opinion revolved around analyzing the actual cost of performance. As an expert, he had visited the jobsite. This visit was after the construction had been completed. The construction had been completed more than three years when Schwartzkopf made his first visual inspection of the site. In his opinion, Excavators had been faced with both inefficiency problems and delay problems from other factors and entities not attributable to the City or Bell. This witness had prepared an analysis or summary of his opinion of the damages in January of the year of trial, being 1991. One of the first elements or items of additional cost was what was described as flatwork. "Flatwork" was the term for the concrete driveways and pavements. This work had originally been

subcontracted to Thomason, but was later done by Excavators itself at an additional cost to Excavators of $102,785. The expert stated that at first this sounded like a very poor business decision, but this was done to keep the work crew together. Query: Was this an element of damages against the City and Bell? We think not.

The appellee's position on this point (in determining to directly perform previously subcontracted work) was that it was being told that the telephone company was working on getting the poles out of the way and that the other entities were clearing the area ahead of Excavators. The expert stated that Excavators had made a prudent business decision. The expert then described another item as being additional equipment cost of $65,374. The expert then included a third item, an additional payment to Thomason. We perceive that the record reflects that this payment to Thomason was an additional sum of money over and above Thomason's contract price to attempt to compensate Thomason. Query: Was this to be charged against the City and Bell? The next item of additional indirect cost amounted to in excess of $31,800. This was based on the expert's testimony that the project could have been finished by September 30, 1986, but was not finished until later. Therefore, if the job had been completed by the end of September of '86, the Excavators could have moved on to other projects and these *so-called indirect costs could have been charged to the other projects. However, no other new, available projects were shown by Excavators.*[1]

The climacteric of this expert's testimony in the record is:

1. During the course of this project the record reflects that Excavators did not recall any other work which may have been available for them to contract for and perform. Seemingly, Excavators concedes that it never actually shut down due to alleged delays but rather performed other work required by the contract. Earl Cooper, Excavators' superintendent, testified:

> Q. When we talk about the days you couldn't excavate out on the Highland Avenue Project, you're not telling the ladies and gentlemen of the Jury on those days you couldn't excavate that you didn't do any other work?
> A. I've never said that at any time, no, ma'am.

Q. And you've come up with a final number for delay or disruption damages in this case of how much?

A. $230,721.

■ The trial judgment was entered in favor of Excavators against the City in the amount of $230,721. This was the exact amount of all the delay and inefficiency damages as testified to by Schwartzkopf to the very dollar and to the very cent. This was also the jury's finding.

Against the city was an additional pre-judgment interest award of $125,494.57.

Additionally, Excavators concedes that it experienced certain excavation delays from *causes other than those alleged in the law suit.* It referred to missing engineering layouts, rain, hurricane, shutdowns, and underground utilities including, inter alia, gas and water lines and certain underground conduits.

It is abundantly clear and firmly established that Schwartzkopf's estimate of damages truly represented the total amount of all factors and by all actors and entities on the job. The jury answered precisely the estimate and amount testified to by Schwartzkopf; hence, the jury answer levels damages against the City and Bell, some of which had to have been correctly attributable to Cable, GSU, Entex, and other subcontractors on the project as well as the professional engineers. Hence, the figure of $230,721 obviously could not be correct; it includes confluent, synchronous damages.

> Q. As a matter of fact, you're not telling the Jury that utilities had you shut down on those days?
> A. I've never claimed utilities has us shut down other than for the excavation.
> Q. You would stop excavation and go do other items of work?
> A. That's correct, ma'am.
> Q. Other items of work were items of work required to be performed by you pursuant to your contract with the City of Beaumont; is that correct.
> A. Yes, ma'am, they sure were.
> Q. You had to do them at some time during the project?
> A. That's right.

Schwartzkopf testified:

Q. Well, let's just move to—finally to the delay portion. And is your figure—are your figures intended to represent the total delay—inefficiency damages caused by any delay to excavation, including delays by TCI or Liberty Cable, GSU, Entex, or anybody else out there?

A. They're intended to represent the total delay by other than normal causes. I mean, clearly on a day-to-day basis, if you get a rainstorm, that's a delay; but that's an expected and estimated in the job delay. The delay from what I call third parties, the people you mentioned, that's the—

Q. Yeah. Your figure's not for damages caused by the delays alleged or charged to the City of Beaumont particularly over water meters?

A. To the extent those are normal delays and I—that's correct.

. . . .

Q. This calculation is not intended to represent damages which you consider attributable to the presence of Southwestern Bell poles?

A. Well, a significant part of this delay, from my reading—and I didn't do a causation analysis. But a significant part of it does appear to be attributable to Southwestern Bell poles.

Q. But you have not done a causation study and no allocation?

A. I have not done an allocation. That's just from reading the jobsite diary—not the diary, the daily reports. They appear to be a significant cause, those poles being there.

Q. You're saying that's true of GSU poles; isn't that correct?

A. I'd have to say I can't differentiate between whose poles they were. It was poles generally.

Thus, Schwartzkopf included delays by GSU and damages caused by GSU as well as others. Again, the $230,721 damage figure encompasses all the delays and disruptions claims and damages attributable to "anybody . . . out there". This damage award was confiscatorily adjudged against the City and Bell. It is unfair; it emasculates due process; an orchidectomy has been performed on the law of damages. Reversible error is proved.

Schwartzkopf testified that through July 31st of the trial, his total charges as an expert witness would be $12,580.34.

In the absence of a contractual provision to the contrary, a contractor situated such as Excavators may be entitled to recover damages from a contractee home rule city, for losses due to delay, inefficiency and hindrance of the work; but the contractor must prove: (1) that its work was delayed or hindered; (2) that it suffered damages because of the delay and hindrance; and *very importantly, (3) that the contractee was responsible for the act or omission which caused the delay, the inefficiency, or the hindrance.* This Excavators has failed to do. The City would not be responsible for delays caused by third parties, or subcontractors, or other utilities owners or operators, or acts of nature, or acts of God; nor would Bell.

### *The Causation Issue*

To undergird and buttress our opinion we note that the record shows from Excavators' expert:

Q. *Okay. You personally can't give us a total amount of days that Excavators & Constructors was delayed on this project?*

A. *I wasn't asked to do that as part of my analysis; so, no, I can't do that.*

Q. *You weren't asked to give any opinions on causation in this case at all?*

A. *No.* (Emphasis added)

Thus, Schwartzkopf unequivocally stated that his opinion of damages was not based or allocated on causation as to the various original defendants and certainly not as to the City and Bell. We perceive Excavators had settled with several other defendants before trial. The settling defendants are not parties in this appeal. The expert testified that there was definitely some overlapping of the delay claims and the inefficiency claims. No productivity study had been done in this case, nor had this expert been asked to do a schedule analysis. The scheduling analysis was to have been furnished and distributed by Excavators; but Excavators failed to do so. Importantly, this expert was asked:

Q. The analysis that you have here is based on an assumption that all of these delays were caused by utilities; is that correct?

A. No, that's not entirely correct. It's based on the assumption *that all of the delays are caused by persons other than Excavators & Constructors.*

Q. *Okay. You haven't segregated these various and sundry delay claims among the various companies involved out on the project?*

A. *I have not been requested to do that, nor have I done that.* (Emphasis added)

"[D]elays are caused by persons other than Excavators & Constructors" definitely includes defendants, entities and factors other than the City and Bell. But the judgment provides that the City and Bell pay all damages—the total, concurrent, intermingled, coeval damages. This is error requiring reversal.

*At another point in his testimony* the expert, Schwartzkopf, unequivocally testified that his figures on damages represented the total delay and the total inefficiency damages and delay damages caused by any delay to the excavation, including delays by Cable, GSU, Entex, or anybody else out on the job. His damage figures definitely included, in the total damages for delay amount, damages caused by a number of entities other than the City and Bell.

*Again,* the expert reiterated that he did not make a causation analysis *and he had not made a study as to the allocation of damages.* His answer was: "I have not done an allocation. That's just from reading the jobsite diary—not the diary, the daily reports."

*This important testimony was reiterated time and again. We find again in the record, question: "Again, you've done no study of causation in this case?" Answer: "That's correct."*

The record reflects:

A. *Well, I don't do a causation delay analysis at all. I'm not quite sure what your question is but I didn't do—I mean, I wasn't asked to do a causation delay.*

I was asked to assume that delays—what the delays were and do a damage analysis accordingly. (Emphasis added)

*Hence, the answers of the expert could not have been inadvertent; they were repeated several times.*

Mr. Schwartzkopf agreed that the job had been finished for about four years before he had first had a chance to even view the project site. Further, as we interpret the record there were included damage estimates made concerning the work taken back by Excavators from Thomason, a subcontractor. Extra labor costs were incurred by Excavators. In usurping Thomason's work, Excavators wounded itself; it failed to mitigate damages.

It must be noted that there is evidence of considerable probative evaluation that Excavators took over the Thomason work because the same would be highly profitable to Excavators; but Thomason had bid the work at a cheaper amount.

The jury answered the damage issue at precisely the same total damage figure given by the expert, namely, $230,721. Hence, this figure was brought forward in the judgment against the City and Bell. *It necessarily is incorrect, egregious, and requires a reversal of the judgment.* The jury's answer necessarily had to include some double damages or elements of damage or overlapping damages or wrongfully assessed damages against the City and Bell. The record proves that the underground construction interfered with the surface excavation work. Hence, Excavators was awarded damages and monies that were disallowed by the basic contract.

We note that an important decretal paragraph of the judgment awards Excavators $230,721.00 against the City of Beaumont, plus interest on that sum from April 3, 1987, through October 18, 1991, the date of the judgment, the total amount of interest amounting to $125,494.57. Thus, this interest award is incorrect. Then this important decretal paragraph orders that this portion of the judgment against the City, together with all pre-judgment and post-judgment interest, shall be a joint and several judgment also against Bell. Thus, the joint and several judgment against Bell is contaminated, erro-

neous, and harmful. In addition, $173,040.75 was ordered to be received by Excavators from Bell, plus certain pre-judgment and post-judgment interest leveled against Bell. Since we have found harmful, reversible error in the initial amount of $230,721, the joint and several liability against Bell must necessarily be reversed.

In a later and paramount decretal paragraph, the judgment decreed that the total amount of the trial judgment in favor of Excavators against the City to be $777,497.23 plus taxable court costs which figure excluded, of course, post-judgment interest and appellate attorneys' fees. But this figure of $777,497.23 included the erroneous figure of $230,721. The paragraph contained an order that was based on the recovery theory of promissory estoppel. Excavators recovered against Bell $537,161.67 and this $537,161.67 amount was awarded jointly and severally against the City and Bell. The erroneous amount of $230,721 vitiates and pollutes the subsequent mathematical calculations.

Then in a later decretal paragraph, the judgment recites that based on the pleadings of the parties, the evidence adduced at trial, and the jury's verdict; the court had determined (pursuant to the terms of the franchise agreement between the City and Bell which was admitted into evidence) that the City is entitled to partial indemnity from Bell for a part of the judgment owed by the City to Excavators. Then the judgment recites that the City have and recover a judgment for indemnity against Bell for all amounts paid to Excavators pursuant to the judgment up to:

(1) 75% of the $226,106.58 in delay or loss of efficiency damages suffered by Excavators for which the City is responsible, [the 75%] totalling $169,579.93;

[Note: the harmful $230,721—less some small credits given the City reducing $230,721 to $226,106.58—is the basis of this erroneous calculation]

(2) 75% of the pre-judgment interest of $122,984.68 on that sum amounting to $92,238.51;

[This amount of interest is wrong]

(3) 75% of the $296,450.00 in attorneys' fees, professional fees and trial exhibit costs for which the City is responsible to Excavators totalling on this third element $222,337.50;

(4) 75% of all the appellate attorneys' fees for which the City becomes responsible to Excavators in the event of an appeal in this case;

(5) 75% of all taxable court costs for which the City is responsible; and

(6) post-judgment interest which accrues on all the sums set out above.

We conclude the City is not indemnified from Bell for attorney's fees, professional fees, and exhibit costs. Again, necessarily, the erroneous, invalid $230,721 is the basis of all the other large awards and for that reason the judgment against Bell must be reversed.

### *Promissory Estoppel*

Under this record, we determine that promissory estoppel is not the basis for an affirmative cause of action leading to a recovery under the facts presented in this case. RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981) has generally dealt with the doctrine of promissory estoppel as being based on that type of promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance. Promissory estoppel becomes applicable if, but only if, injustice can be avoided only by the enforcement of the promise. *But a promise must be made.* We conclude that no promise was made; we conclude Excavators did not rely on Dillard's utterances; and we so hold as a matter of law. Promissory estoppel in its basic requirements demands: (1) *a promise,* (2) *foreseeability of reliance thereon by the promisor,* and (3) *substantial reliance by the promisee to his detriment.* *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983); *Traco, Inc. v. Arrow Glass Co., Inc.,* 814 S.W.2d 186, 190 (Tex.App.—San Antonio 1991, writ denied). Excavators has failed in each of these requirements.

Decisional precedent establishes a fourth and separate element or requirement to engage the doctrine of promissory estoppel. That fourth and separate element is a

definite finding that *injustice can be avoided only by the enforcement of the promise. See Fretz Const. Co. v. Southern Nat. Bank, Etc.,* 600 S.W.2d 878 (Tex.Civ.App.—Houston [1st Dist.] 1980), *rev'd and remanded on other grounds,* 626 S.W.2d 478 (Tex.1982). Moreover, Excavators has failed to prove the correct *measure of damages under promissory estoppel.*

In a guarded manner, we perceive, the Texas Supreme Court has refraining from overtly and affirmatively condoning approval of promissory estoppel in situations such as the one before us. The Supreme Court has written on this issue and stated that *estoppel is defensive in nature and operates to prevent the loss of an existing right. It does not operate to create liability where it does not otherwise exist. Hruska v. First State Bank of Deanville,* 747 S.W.2d 783 (Tex.1988).

The alleged promises that were sought to be made actionable against Bell, we determine, occurred at the preconstruction meeting of April 17, 1986. The record reflects that when the parties met on April 17, 1986, a contract had already been signed between Excavators and the City. Excavators had by a prior, solemn contract committed itself to performing the project in 220 working days and finalizing the same in 240 working days with or without Bell's alleged promise to do anything. Excavators did express its hope to complete the project within six months.

Comments were made during the preconstruction meeting to the effect that Excavators had an on-going, binding commitment to the project and a commitment to complete the contract. Excavators said that it needed a work order right away on that very day and that it was even ready to start a month prior to the preconstruction meeting. Excavators explained that its employees had assembled their barricades and it could be out on the project area working by the following day. Excavators announced it was planning to work five or six days a week. In view of these statements, it is impossible to conceive how Bell could have reasonably foreseen Excavators' alleged reliance on any utterances of Bell or on the doctrine of promissory estoppel or how Excavators could have relied

upon any so-called negligent misrepresentation, if any, made by Bell.

At this same meeting it was clearly shown that GSU still had a good deal of work to do in the future and the representative of Bell clearly warned and notified the attendees that Bell would be able to start its work as soon as GSU had completed its project. Furthermore, Bell's representative merely stated that Bell was looking at probably four weeks on Bell's part; but no starting date was given for Bell. At that time none could be given because Bell had to wait on other parties, including Cable and Gold Crest Electric Company, among other factors. The weather was one factor. In fact, the owner of Excavators explained that (depending on how many people Excavators decided to put on the job): "We don't intend to drag our feet that's for sure." Excavators was in a big hurry. There was no reliance by Excavators on the phone company's utterances.

Furthermore, the phone company's representative clearly explained that GSU had to complete its work and then Cable had to transfer everything (including all of its lines) and complete its work before the phone company could start. There simply was no promise in the sense of a legal promise that Excavators could rely upon. Bell's representative explained that there were going to definitely be some problems with Entex. The representative of Excavators acknowledged that it would do storm sewer work which involved underground construction, implicating the "no damage for delay" clause.

In fact, Excavators at the preconstruction meeting was noticed and warned that the phone company had an underground system and that a manhole was involved, demonstrating underground construction and work and this brought again into play the "no damage for delay" clause. This clause certainly applied to the owner-operator of the phone utility as to underground work.

Furthermore, at the same meeting Excavators was specifically warned and noticed to the effect that Bell and Cable as well as other utilities were going to run into problems at the location of the school and possibly with property owners and also with some prehistoric oaks. Hence, Excavators knew

that there were possibilities and even probabilities of delays. In fact, all the parties were warned concerning the property owners and concerning the prehistoric oaks. Interested citizens were very particular about these large, ancient oaks. These citizens desired to completely protect these beautiful trees adjoining a nostalgic high school.

We conclude that the so-called alleged promises were merely utterances or some speculative ideas as to future events. No negligent misrepresentation occurred. During the April 17th discussion at a point—but not as a response or answer to any question or query posed by Excavators—Bell's representative, Scott Dillard, stated that Bell was "looking at probably four weeks on our part"—"probably" is the operative word.

Later in the same meeting, Earl Cooper, the superintendent and representative of Excavators, posed a question to the different utility representatives. The question in general was, "how long would Excavators be looking at everybody getting off the pole so that they could be moved." In response to that question there was no definite or set time frame. Bell gave no response and made no promise as a response to the query. Bell maintains that it was speculative as to the timing of Bell's instigation and completion of the relocation work.

Moreover, Bell maintains that although making no promise or response after Earl Cooper's statement that Excavators wanted to complete the project in about six months, Bell later went back to its drawing board and completely redrafted its plan to provide a mostly aerial relocation of its lines. Such aerial relocation would be quicker. Bell had originally planned for underground construction. Bell contends it accommodated Excavator's schedule as readily and as reasonably as could be. Excavators never solicited a time and sequence commitment from Bell. Excavators did not contact Bell while Excavators was preparing its bid or entering into the contract with the City.

We hold that the burden was on Excavators to prove that it was induced to act and did act in reliance upon the alleged promises by Bell. Excavators failed its burden. Excavators' actions disproved any reliance.

The doctrine of promissory estoppel is defensive in nature. We conclude that the doctrine of promissory estoppel is not available to Excavators. We hold that Excavators cannot recover lost profits or anticipated profits or increased profits under the doctrine of promissory estoppel under the record before us.

### The Doctrine of Negligent Misrepresentation

By like reasoning, the theory of negligent misrepresentation does not entitle Excavators to lost profits or damages. *See* RESTATEMENT (SECOND) OF TORTS, § 552B (1977). This provision mandates that the damages recoverable under the theory or cause of action known as negligent misrepresentation are only those damages which would necessarily be awarded to compensate the plaintiff-litigant *for actual pecuniary losses he has suffered upon and because of his actual reliance upon the misrepresentations—but here there is no reliance—nor negligent misrepresentation.*

Under this doctrine of negligent misrepresentation, the defendant must supply known false information. *Federal Land Bank v. Sloane*, 825 S.W.2d 439 (Tex.1991). We find that Bell did not supply *false information under this record.* Dillard's utterances were guesses as to future, unknown happenings; they were not information. Dillard did not knowingly lie about the future. Again, under this theory, we fail to see that Excavators demonstrated reliance by evidence of probative value. The RESTATEMENT provides that damages for this tort *do not include the benefit of the plaintiff's contract with the defendant.* Here again, however, there was no contract or privity of contract between Excavators and Bell. *See* RESTATEMENT (SECOND) OF TORTS § 552B (1977). *See also* RESTATEMENT (SECOND) OF TORTS § 552, Comment a. Under this doctrine of negligent misrepresentation the Supreme Court wrote in *Federal Land Bank*, 825 S.W.2d at 443: "We decline to extend damages beyond those limits provided in Restatement section 552B."

The utterances had to do with future events. There were complicated problems with the future events. There were hindrances and delays inherent in the future events. Bell's actions were dependent upon the actions of third, fourth, and fifth parties.

From what has been discussed above, it appears that the element of justice must be established in order to truly invoke the doctrine of negligent misrepresentation or negligent representation. We think that injustice to Excavators has not been shown in this record. We find no evidence of negligent misrepresentation. Excavators made a handsome profit on the project.

Indeed, we decide a very careful reading of the transcript of the preconstruction meeting demonstrates it was replete with warnings and admonishments by Bell to Excavators of Bell's uncertainties of having to wait on the completion of the work of others, of no definite beginning date, and no definite ending date. We perceive that an essential element of the cause of action based on negligent misrepresentation is that the negligent misrepresentation had to contain the element of negligence at the time it was uttered. There is no evidence that what Bell's representative uttered was done in a negligent manner. He was not clairvoyant; he was not a seer of the future. In fact, a very careful reading and analysis of the notes and verbatim transcription of the preconstruction meeting would show rather that the speaker uttered statements that were full of caution.

### Burden of Proof on Damages— Whose Burden?

The amount of damages needs to be proven with reasonably certainty as to each defendant. This is the plaintiff's burden. The causation or causal connection between the event sued upon and the plaintiff's injuries or damages *must be demonstrated by evidence of probative value. See and compare Morgan v. Compugraphic Corp.,* 675 S.W.2d 729 (Tex.1984). When dealing with a contract of construction, the plaintiff has the burden to show the nature and extent of the various alleged delays and the damages which are connected or caused by the delays on each defendant's part. *See and compare*

*Wunderlich Contracting Company v. United States,* 351 F.2d 956, 173 Ct.Cl. 180 (1965); *see and compare J.D. Hedin Construction Company v. United States,* 347 F.2d 235, 171 Ct.Cl. 70 (1965). No causation proof of probative value was presented. Proving the total of confluent, synchronous, coeval damages is wholly inadequate.

### Apportionment of Damages

Furthermore, there was no apportionment of the damages between the two remaining defendants. Under established rules of damages as applied in Texas, when certain damages or injuries result from two or more different causes and one defendant is liable for some of the causes of the damages but not all; then in order that there be a proper award of damages, it becomes incumbent for the plaintiff to establish which portion of the damages resulted from the causes for which a particular defendant is liable. 28 Tex.Jur. 3d, *Damages,* § 227 (1980); *see and compare, Tucker Oil Co. v. Matthews,* 119 S.W.2d 606 (Tex.Civ.App.—Fort Worth 1938, no writ); *see also and compare Panhandle & S.F. Ry. Co. v. Wiggins,* 161 S.W.2d 501 (Tex.Civ.App.—Amarillo 1942, writ ref'd w.o.m.).

### The Pleadings of Excavators

Excavators' causes of action against Bell encompassed negligence, negligent misrepresentation and promissory estoppel. Excavators alleged breaches of certain representations or promises allegedly made by Bell.

Additionally, Excavators pleaded for attorney's fees and interest and sued the City for its expert fees and also for its trial exhibits. In the latter part of April 1991, the City filed a cross-action against Bell for indemnities allegedly due the City pursuant to the City's Gross Receipts Ordinance No. 85–50—the franchise. This particular cross-action was to be tried separately as announced by the trial Bench.

The jury responded to the questions and found in pertinent, relevant part that the City had failed to comply with its obligations to relocate the utilities and that Bell caused delay damages.

### Bell's Position on Indemnity Under the Franchise

Bell contended that before the entry of the final judgment at trial level, Excavators elected to recover against Bell solely under promissory estoppel, being the only theory affording recovery of attorney's fees by plaintiff. We determine Excavators cannot recover attorney's fees, experts' fees, and its exhibit cost against Bell. Furthermore, Bell complained that in what it contended to be a surprise ruling (and without any notice or opportunity to present any evidence), the trial court entered a judgment in favor of the City against Bell under the indemnification theory. The indemnification part of the judgment ruled that the City was entitled to certain partial indemnities for the amount it was required to pay to Excavators.

Later, in December of 1991, pursuant to a request of Bell, the trial court rendered findings of fact and conclusions of law dealing with the City's indemnification claim against Bell. In January of 1992, certain supplemental findings of fact and conclusions of law were rendered. However, Bell's later objections and requests for either additional or amended findings of fact and conclusions of law were denied by the trial judge.

Bell presents points of error contesting the judgment in favor of the City adverse to Bell, based on indemnification under Ordinance 85-50. Bell contends that prior to the trial of Excavators' claims, the trial court determined to hear the indemnification cross-action against Bell at a later, separate time. Accordingly, the trial proceeded only on Excavators' remaining theories against Bell, the City, and Fittz & Shipman, Inc. Fittz & Shipman was dismissed at the close of the evidence by the trial court.

### Bell's Points of Error Two, Three, and Four—Challenging the Damages Awarded

The record clearly reflects that the only measure of damages and the amount thereof proffered by Excavators was its so-called loss of efficiency and delay damages which resulted from multiple factors and resulted also from multiple actors and parties, including one subcontractor who was not a party.

These elements of damages and amounts of damages were not restricted to Bell's alleged nonperformance or the City's alleged failure to relocate certain water meters and coordinate certain other utility relocations.

Excavator's expert gave testimony that his ultimate conclusion and bottom line figure was based on a total number of delays and inefficiency damages that were caused by actions of numerous entities and natural forces other than the City and Bell and that, furthermore, the damages suffered by Excavators included multiple factors and utilities other than water meters and poles. The record reflects (by Schwartzkopf):

Q. In this case you have not been requested to do a schedule analysis, have you?

A. That's correct.

Q. And you haven't done a schedule analysis?

A. And I have not done one.

Q. The analysis that you have here is based on an assumption that all of these delays were caused by utilities; is that correct?

A. *No, that's not entirely correct. It's based on the assumption that all of the delays are caused by persons other than Excavators & Constructors.*

Q. Okay. You haven't segregated these various and sundry delay claims among the various companies involved out on the project?

A. *I have not been requested to do that, nor have I done that.*

Q. And you understand that it's customary in the construction business for utilities, specifically those having aboveground poles, not to move their pole until everyone's off of that pole? Isn't that typical?

A. To restate what I think you said, normally the owner of the pole won't move that pole until all of the wires are off of the pole, no matter who they belong to.

Q. And that's the practice in the industry?

A. *That's the practice in the industry.*

. . . .

A. Are you saying delay hours?

Q. No, layouts.

A. I'm not—I can't reference that—how I use that term.

Q. *Well, the engineer has some relocation and layouts to prepare.*

A. *Oh, you mean the engineering drawings?*

Q. *Sure.*

A. *To the extent those weren't normal delays, they would be calculated in that. I have to say I've done no analysis to say how much should be attributable, if any, to the engineer for not getting drawing changes out promptly. I just don't know.*

Q. *The point is that many items are included or can be included in your calculations of damages here which are attributable to causes other than the presence of Southwestern Bell poles or the presence of Gulf States Utility poles?*

A. *There could be other causations; that's correct. I've not done nor have I testified that I've done any causation analysis.*

. . . .

Q. Of the 89 downtime days that are claimed in the original Excavators & Constructors' claim, did you determine if any were rain days?

A. *Yes, sir. There were eight rain days included in the claim.*

Q. *Hurricane Bonnie included in the claim?*

A. *Yes.*

Q. *Is it proper for a contractor like Excavators & Constructors to claim delay damages against a utility company or against anyone else for a workday on downtime when the weather prevents it?*

A. *No, sir, that's not proper.*

(emphasis added)

Schwartzkopf affirmatively admitted and conceded that he had conducted no causation study to determine with any specificity what portions of any alleged damages resulted from Bell's conduct; nor what portion of the alleged damages resulted from the City's conduct; nor what portion of the alleged damages resulted from GSU's conduct and the conduct of other parties to the suit and other actors and entities on the job. Nor did Schwartzkopf determine and reach a conclusion concerning what portion of the alleged damages resulted from acts of nature such as hard rains and a hurricane. But, in spite of this damage evidence offered by Schwartzkopf that the amount of $230,721 was the full damages from numerous factors and entities; nevertheless, the jury answered question number ten in that exact amount. Bell and the City simply did not cause that amount of damages.

Also, the jury's award is clearly erroneous and mathematically wrong, because the amount includes delays and matters of underground construction. *See and compare Hurst v. Sears Roebuck & Co.,* 647 S.W.2d 249 (Tex.1983).

### Jerry Braxton's Testimony on Profits

■ Upon the trial of the case, Mr. Jerry Braxton was a witness. He was the 100 percent owner of Excavators. He stated that the usual industry profits would be and should be between 15 and 20 percent on this job. This record reveals that on another occasion, he had given sworn testimony that the profit might range from 20 to 25 percent—but not more. Excavators had made a profit of 16.7 percent. However, with the award of the additional $230,721, the percentage of profit would rise to about 41 percent. This large profit margin additionally defeats a basis of recovery based on promissory estoppel because Excavators did not and cannot demonstrate that an injustice was done to it. Upon this additional basis, Excavators as a matter of law is not entitled to recover its attorney's fees and other litigation fees and expenses against Bell. In accordance with the above discussion we therefore sustain Bell's points of error two, three, and four.

### Bell's Points of Error Five, Six, Seven, and Eight—Refuting Promissory Estoppel, Allocation of Fault, And Attacking the Trial Court's Rulings on Certain Motions

The record explicitly demonstrates that Bell could not have foreseen that Excavators would rely upon any utterances made by

Bell's employee. In fact, Excavators did not rely. The utterances could not be interpreted as a promise upon which Excavators should or could rely nor which the person making the utterance could or should have reasonably expected would induce any detrimental action or forbearance on the part of Excavators. RESTATEMENT (SECOND) OF CONTRACTS § 90(1). A promisor—and Bell was not a promisor—and certainly a maker of an utterance cannot be held liable under this record. A promisor can only be made liable by meaningful reliance upon his or her promise where he or she does foresee or should reasonably foresee reliance.

But this record is one that negates any reliance. Excavators did not cancel its $973,701.50 contract with the City in which it had a 16.7 percent profit. Excavators never informed Bell that it contemplated actually walking away from this signed, binding contract with the City. In fact, Excavators' pragmatic corporate acts disprove any such "walking away". We simply do not perceive that Excavators was in any position to "walk away" from this lucrative contract. Excavators contends it could have "walked away" from the contract. Since it did not "walk away", Excavators argues that that proves reliance. We disagree. Under this record, Excavators could not with impunity "walk away." Excavators had no such intentions. Clearly, there was no evidence of a causal connection between Bell's utterances and any alleged reliances. In fact, at the preconstruction meeting, it was announced that Excavators had already executed the basic contract with the City for this street-widening project. Query: In practicality, how could Excavators "walk away" from this lucrative street-widening contract?

At the preconstruction meeting an authorized representative of Excavators made statements such as: "We need a work order today. . . . We were ready to start a month, a month and a half ago. . . . Our barricade people will be out there tomorrow. . . . We can start our drainage from that end. . . . We are planning on working five or six days a week eight hours." Excavators was literally chomping at the bit to begin the work.

The employee of Bell who made the utterances spoke them in an ambiguous and uncertain way as to the time or times involved. The utterances did not induce any action or forbearance from action on the part of Excavators. RESTATEMENT (SECOND) OF CONTRACTS § 90 further mandates that for a promise to be actionable and to be binding upon the promisor an injustice must be involved and the promise is binding *if, but only if, an injustice can be avoided only by enforcing that promise. No injustice to Excavators is shown. Excavators recovered its anticipated profit.* Thus, we sustain Bell's points of error five, six, seven, and eight. We reverse the judgment below. *See and compare Federal Land Bank v. Sloane,* 825 S.W.2d at 442.

Under this record, Excavators did not show in what manner that it would have walked away from this lucrative contract or that it even contemplated a walking away from this profitable deal. Again, Excavators violated the scope of the work when it breached its contractual duty by starting its work when it did. We fail to find in this lengthy record evidence that established that Excavators would have acted differently than it did act if the uncertain, conditional utterances had not been spoken. Certainly no causal connection was shown; nor is producing cause; nor is proximate cause demonstrated. *Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 236 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Again, we sustain Bell's point of error eight. Excavators, we determine, can take nothing by way of its alleged negligent misrepresentation. Nor can it retry the same unless a remand is ordered by the Supreme Court.

Under this entire record, we additionally conclude that the great and overwhelming weight and preponderance of the evidence is contrary to the jury's finding on question number nine dealing with Bell's alleged negligence. We reach the same conclusion on the jury's findings as to as Excavators' negligence and GSU's negligence. The jury's answer to question number ten—the main damage issue—is incorrect because the evidence is greatly insufficient as to the exactness of the amount.

██ Our Court of Appeals can unfind facts. We cannot find facts affirmatively. But, note that on this point (of Bell's negligence) the overwhelming preponderance of the evidence shows Bell had hired an extra contractor to perform underground work and Bell's crews immediately returned to the project following Hurricane Bonnie in spite of the fact that Bell had extensive hurricane damage and needed to repair much of its phone system for its regular customers all over Beaumont and surrounding territory. Work crews from other states were brought in to help this emergency situation. One witness, Richard Faust of Fittz, and also the City Inspector Gary Richardson, both testified that Bell was always responsive to requests for relocations and did not delay Excavators. David Statten, the superintendent for one of Excavators' subcontractors, testified that Bell did not delay the progress of the project. We find and hold that there was pervasive underground work and buried work that had to be done in connection with certain utilities—some of which belonged to Bell. The record proves in connection with the preservation of the old, historic oak trees that Bell decided to go underground with that portion of the work being designated as the center section. Otherwise, Bell would have received heavy, defeating flack from the Historical Society of Beaumont and other powerful groups of citizens.

Bell had contracted with an independent contracting company known as Rody Construction to do certain underground construction and buried work on the Highland Avenue project. *This was done by Bell to expedite matters and to accommodate Excavators.* The record also clearly reflects that realistically before Bell could do anything, GSU, Cable, and others had to complete their work. The record shows that Cable did not attend the preconstruction meeting. Excavators apparently never called or notified Cable; nor did Excavators first contact Cable after the close of the preconstruction meeting.

Noteworthy is this evidence:

Q. Do you have any criticism or complaint about Gulf States? Do you think Gulf States delayed excavating or Excavators on this project?

A. I believe Excavators was delayed. I have no—I can't make a statement as to who did the most, who did the least.

Q. Okay.

A. I know in my dealings with Southwestern Bell, if I called up and asked them to do something, I felt like they were pretty responsive.

. . . .

Q. Did you have on-the-site meetings with Southwestern Bell employees about the utility conference?

A. Yes, sir, I believe along with all the utilities I had some with GSU and Liberty Cable, and I believe we had some with Entex.

The above testimony was given by Richard Faust, an employee for Fittz & Shipman, the consulting engineers on the project. Faust was a professional engineer.

As noted above, Excavators breached the basic contract in that it definitely and affirmatively started its construction and its work prior to the time the relocation of telephone, electrical and water utilities was completed. In addition to that, Excavators proffered the witness Faust. This witness vouched for the fact that the owner, being the City of Beaumont—not Bell, should have furnished the lands upon which the work was to be performed. Furthermore, easements for permanent structures or changes in existing facilities would be obtained and paid for by the City. The provisions in the contract place these relevant duties and obligations upon the City—not upon Bell. But we have held no duty was owed by Bell to Excavators. The issue of the negligence of Bell is to be retried only if ordered by the Supreme Court.

### Bell's Point of Error Number Twelve— The Limiting Instruction

██ Bell's point of error number twelve charges that the trial court erred in submitting certain jury questions, being six and seven, in the form submitted because they failed to include Bell's requested limited instruction. Bell argues that TEX.R.CIV.P. 277

was not heeded. We agree. We conclude jury questions six and seven were incomplete. See *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144 (Tex.App.—Texarkana 1988, writ denied); *Reeves v. Hall*, 437 S.W.2d 424, 428 (Tex.Civ.App.—Austin 1969, no writ). Questions six and seven failed to include a proper rule or concept as set out in *Stowers v. Harper*, 376 S.W.2d 34 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.). It must be shown that the representation of the promisor to be estopped caused the other party to act in a different, affirmative way from the way that the promisee acted. This different action must be to the promisee's prejudice. If these elements do not exist, then no estoppel arises. *Id.* The requested instruction was substantially correct. We have held that promissory estoppel is not applicable to this case. We do not retreat therefrom. This paragraph is implicated only upon a remand by the Supreme Court.

### The Indemnity Issue

■ Bell strongly argues that the court announced that the City's cross action against Bell would be separately considered and tried. There was no attempt either to prove up properly the indemnity clause or to defend against it during the three week trial. Bell maintains this: that despite the trial court's prior commitment to try the indemnity clause issue in a separate manner; nevertheless, the court proceeded to render judgment against Bell for about half a million dollars. Bell says that it had no prior notice and absolutely *no prior opportunity to present any evidence in defense of the indemnity claim.*

The City, contends Bell, did not timely submit any proposed judgment regarding the indemnity claims. Bell objected, urging the court to leave the indemnity issue for a later time. Bell's request was refused. Later certain objections to the entry of the proposed final judgment were lodged. Bell contends that the court proceeded to enter *sua sponte* its judgment and award untried indemnification damages against Bell amounting to the large sum of $484,155. Bell claims it did not have its day in court. Bell claims that such an act is an apparent and patent

denial of Bell's constitutional due process rights of having its day in court on the merits and having notice of the type of proceeding against which it must defend. We conclude that Bell should have been given its full day in court.

We conclude that Bell was not given a reasonable opportunity to be heard and to defend in an orderly manner. A valuable right that Bell was not afforded was the right to present evidence and to cross-examine witnesses in defense of claims against it. In view of our rationale we sustain Bell's points of error number thirteen, fourteen, fifteen, and sixteen. These points urge lack of procedural due process, error in misconstruing the intent of Bell and the City as to the indemnity clause, and the no evidence and factually insufficient evidence points involved. A governing, relevant section 15 of Ordinance 85-50 in part employs the following wording:

> Company, its successors and assigns, shall indemnify, save and hold harmless City from any and all claims for *injuries and damage to personal property occasioned by or arising out of the construction, reconstruction, maintenance, operation or repair of said companies communication system . . . .* (emphasis added)

Excavators sought money damages for delays. This widening project on Highland Avenue, we perceive, resulted in betterments and improvements. We think that there was no damage or detriment to the City's personal property as contemplated by the franchise ordinance. After completion this street project yielded beneficial results. We opine that the gravamen and thrust of the indemnity clause fails to encompass betterments and improvements. Clearly, the City did not indemnify itself against its own actions, negligences, or defalcations. The indemnity does not envision purposeful and necessary relocations. The City has not placed itself by evidence within the indemnity clause. Bell here was not exercising privileges; it was discharging its burdens to the tune of about $375,000. The City used some of the poles for traffic lights and vehicular control. The City did not show its entitlement to recover in view of section 10 of Ordinance 85-50

involving the use of traffic lights or other systems, Bell not being responsible to any party whatsoever by reason of construction or maintenance of traffic and other wires belonging to the City. Nor has the City discharged its burden of proof under section 3 of Ordinance 85–50 dealing with reimbursements to Bell. These indemnity clause issues are to be given full evidentiary court hearings if the Supreme Court orders a remand.

### Underground Work by Excavators

Earl Cooper was Excavators' representative on the job and acted as the superintendent for the job. He was Excavators' ace witness. We conclude that his testimony acknowledges that there was underground construction to be performed. The scope of the work proved that underground construction was to be performed. As well as underground work, a sub-base had to be prepared. Earl Cooper testified:

Q. One thing I wasn't quite clear on, when you get down here you're talking about the steps and you have four (4) is underground work and five (5), excavate, six (6) is prepare sub-base and on and on. You are not meaning to tell us you have to finish step four (4) before step five (5) or you've got to finish five (5) to do any of six (6), seven (7), eight (8) or nine (9)?

A. No, ma'am. Some you do have to, but not all.

Q. You've got to excavate before paving the street?

A. That's correct.

Q. That's one thing. But, you could be doing excavation and underground work and some sidewalk and driveway work at the same time; is that correct?

A. Yes, ma'am.

Q. As a matter of fact, that was taking place on this project.

A. Yes, ma'am.

Considerable, important storm sewer improvements were to be accomplished including the extension of inlet leads and building new inlets to the storm sewers. Water line improvements were to be performed by replacing six-inch, cast iron water lines with eight-inch, asbestos cement water lines, these being placed underground. There is ample evidence that Bell had originally planned and designed major underground cables and underground relocation of its facilities along Highland Avenue. This was certainly underground work. Evidence also exists that Bell later decided (that in order to speed up the relocations of its facilities) it would place some of these facilities aerially. The aerial plans could be executed more quickly to accommodate Excavators. The preconstruction conference anticipated underground work such as storm sewers. The underground construction was so intermingled with the other work so as to invoke the "no damage for delay" clause.

### The Question of Damages Awarded Against Bell

In the record before us the expert for Excavators, Schwartzkopf, failed to make any allocation of damages. He failed to limit the damages to water meter and above ground utilities. Above in this opinion, we have set out that the overall figure testified to, being $230,721, included all types of delay and alleged inefficiency damages suffered by Excavators from all sources. These factors included factors other than water meters and above ground utilities. Thus, Excavators' position on damages is unhorsed. The wording of question ten cures nothing. The answer to ten ($230,721) is grossly excessive as to water meters and above ground utilities. The *allegata et probata* and the verdict are at war. The expert also testified that he conducted no causation study to determine what portion of the alleged damages were caused by Bell.

This oft-repeated damage award was shown by overwhelming evidence to have been garnered from a compilation of information provided by certain employees and agents of the plaintiff. This information was prepared and compiled about two years after the law suit had been initiated. The basic information used for the compilation was not verified for its accuracy or reasonable certainty by Schwartzkopf. The amount of damages awarded simply did not have a

causal connection or correlation to the damages set against the City and Bell.

### Important Miscellanea

██ The trial Bench determined that Article 8, entitled "Contract Documents" of the basic contract, was ambiguous and also incomplete because numerous blanks in the form had not been filled in—nor was it exclusive in its thrust and relevancy. The trial Bench concluded that the scope of the work was a part of the basic contract. We agree. The trial Bench stated that the basic contract was ambiguous and that the meaning of that contract was going to be submitted to the jury as a fact-finding function. However, as we analyze the charge and special questions, this was not done. Parol evidence on numerous points was freely admitted before the jury. The trial Bench tended to conclude that said Article 8 was to be read in harmony with the "no damage for delay" clause and thereby be applicable to the general, overall construction.

Earl Cooper acknowledged that Excavators' work had been shut down on certain days because of rain. He also acknowledged that traffic poles owned or operated by the City or traffic signals and vehicle control devices were holding up the work. This was an alleged delay on the part of the City and was not attributable to Bell. Cooper made a special appeal to the City to expedite the moving of all obstacles that delayed the project. He referred to water meters and to poles owned by utilities—more than one. He acknowledged that underground construction and work and sewer work had been delayed. Clearly, the "no damages for delay" clause applied to these delays. Cooper's position was that the City had delayed matters because of the necessity of keeping traffic lights and traffic control devices in working order. The motoring public had to be regulated and protected to avoid accidents, personal injuries, including death. Bell had no duty to any entity in regard to the traffic lights.

Earl Cooper testified that there were delays caused by Fittz & Shipman. His testimony was of probative value on the issue that the gas and electric utilities caused delays beginning at Alabama Street and continuing forward. The learned, scholarly, and conscientious trial Bench instructed a verdict in favor of Fittz. With respect and deference this ruling, we conclude, was clearly error. In view of the record relevant to delays caused by Fittz, those delays and damages and costs cannot be taxed against Bell.

Query: Why should Bell pay for Fittz' actions or inactions whether it included conduct less than the proper professional engineering conduct or not? In this record this much is clear. Bell owed no duty to Fittz. Bell had no contract with Fittz. Bell wasn't doing any work or construction that affected even to the slightest degree, Fittz. Therefore, any inactions or actions that caused delays committed by Fittz could simply not be visited upon Bell. Whether Fittz conducted its affairs in a manner to reach professional engineering standards and criteria or not, would not be a defense available to Fittz as against Bell. As an example, Bell should not have to pay for the delays caused by Gold Crest Electric Company which was an ordinary electrical subcontractor and was not doing professional engineering work. If Fittz had been simply another contractor, Fittz' delays could not be charged to Bell. We point this out because at trial the test used and the standard employed to instruct a verdict in favor of Fittz was that evidence of violations of professional engineering standards was lacking. This was an irrelevant test as to the rights of Bell. We respectfully differ. The instructed verdict as to Bell was error.

Bell was not concerned *vis-à-vis* Fittz' professional engineering conduct or standards. But we perceive that the major thrust and the severe gravamen of Earl Cooper's testimony was that the City was to blame for the most number of delays.

From notations in the daily reports and the daily diaries of Earl Cooper, it was demonstrated that underground utilities and underground construction were involved. The daily diary was a personal record; the daily reports were the records of Excavators. Earl Cooper testified at some length interpreting the basic contract. He was not an

attorney. He testified clearly that the City had the duty and had the responsibility to see to it that the utilities were out of Excavators' way. He definitely felt like it was the City's duty and obligation to provide Excavators with a clear area in which to work. Cooper testified that he considered the scope of the work to be an important part of the contract. He described it as a brief summary of the entire project and it contained the requirements of the project.

The scope of the work provided in relevant, controlling part:

This project will join two recently constructed roadway improvement projects. These are the Irving Street Extension, and the widening of Highland Avenue from U.S. 69, 96 & 287 to Florida Avenue. This project will consist of street, storm sewer and water line improvements, along with new sidewalks and driveways. *The relocation of telephone, electrical and water utilities will be required prior to the start of construction.* (emphasis added)

Excavators did not heed this provision; all of the alleged delays resulted from Excavators insistence to begin its work immediately. Cooper acknowledged that the scope of the work was *a part of the contract documents.* Cooper insisted that when he and Excavators prepared and submitted the bid to the City that one of the important documents was the document called "Scope of Work". Excavators had violated the scope of work unquestionably.

Then, surprisingly, Mr. Cooper was asked by his own counsel:

Q. I've got some questions for you about the first page of the scope of the work provision. Let's see if I can get to it here. The third paragraph, last sentence says, "The relocation of telephone, electrical and water utilities will be required prior to the start of construction." Correct?

A. That's correct.

Then comes another basic inquiry and evidence of a fundamental breach of the basic contract:

Q. And, on April 17 when you were at the preconstruction conference you knew that not only was the—you knew that the—that the relocation of these utilities had been completed [sic]?

A. That's correct.

We definitely determine that there had to be a typographical error in the question. It must have been that the relocation of these utilities had not been completed—the word "not" was omitted.

Q. Why did you go on and take the job if you knew they hadn't completed the relocation as they indicated?

A. During the preconstruction meeting they indicated to us that they would get out of our way and be out of our way for the construction.

Of paramount importance are these questions and answers. Earl Cooper said "they indicated". Indications are not promises. Indications are certainly not legal promises upon which legal reliance can be based. Earl Cooper overthrew Excavators.

This crucial part of the record makes it glaringly clear that Mr. Earl Cooper, a stellar witness for Excavators, and the superintendent on the job, acknowledged and, indeed, insisted that the scope of the work was a part of the basic contract and was considered in making Excavators' bid. His testimony can only be taken to be an admission that the scope of the work dictated and unequivocally required that all the telephone, electrical and water utilities had to be completely removed and relocated and that these completed relocations had to take place prior to the start of any work by Excavators. His testimony and this record prove that Excavators breached this contractual prerequisite. Nevertheless, Cooper knew the actual situation at the jobsite and made allowances therefor in the bid.

Necessarily, here, we digress, but in a most important manner, we point out that during great stretches of this record that there were apparently numerous lengthy conferences at the bench concerning trial procedures including objections to evidence, objections to exhibits, and numerous objections from various counsel. For the most part, the large majority of these conferences at the bench were not recorded. We do not know what took place.

The record reflects that Mr. Earl Cooper gave a deposition that lasted nine to ten days and that he was on the stand as a live witness before the jury for three to four days. We commend him for his candor and his patience. We sanguinely conclude that he testified truthfully to a number of breaches of the basic contract that were committed by Excavators. We conclude that Cooper's testimony along with the entirety of the record, although separate and apart from Schwartzkopf's expert testimony, demonstrates that the jury's money award against the City and Bell was erroneous. In the alternative, we hold that the money award was against the great weight and preponderance of the evidence to the extent that it was manifestly unjust and clearly wrong. This alternative ruling is made in the case of a remand ordered by the Supreme Court.

We perceive that there was only one, or perhaps two, telephone poles left standing after October 10th, or certainly after October 20th, 1986. Counting the six-month period after April 18th or 20th, 1986, Bell had virtually completed its relocation of poles by the end of the six-month period anticipated and desired by Excavators for the completion of its work. In any event, the one or two telephone poles remaining after October 10th or October 20th could not have caused the damages in the amount awarded by the jury against Bell. It is correct that Excavators started to do some necessary work prior to mid-May in 1986. However, the substantial efforts of Excavators began on or about May 20th or May 22nd, 1986. Counting from the May dates, the six-month period would have ended on or about November 20th or November 22nd of 1986. After that November date the record reflects cogently and compellingly that there was one and only one telephone pole left standing. In view of the entirety of this opinion—we admit it is lengthy—but there are justifications for its length—and in view of the mathematical calculations concerning the $230,721 award and its sequelae and after a review of Earl Cooper's testimony, we conclude that we have complied with *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986) and its dicta.

We conclude that evidence-wise and especially from the evidence of the plaintiff Excavators that under the judgment the City and Bell have been wrongfully cast in an adverse judgment for delays caused by GSU, Cable, Entex, Fittz, and other contractors and subcontractors on the Highland Avenue project. A few delays were occasioned by Excavators itself. Excavators moved its own crew to another city to do work while the Highland project was in progress. We stress that this crucial evidence comes from witnesses proffered by Excavators. A very important phase of Cooper's evidence is that by September 1, 1986, Excavators had stopped working on the west side of Highland Avenue and thereafter moved over to the east side of Highland. Cooper acknowledged that after September 1st, Excavators was excavating on the east side of Highland. On the east side of Highland were located the poles of GSU. Bell's poles were on the west side. He testified without equivocation that there was but a single pole that belonged to Bell that was relocated in the very early part of December 1986.

Bell had no pecuniary interest in the contract or in the project. Bell could certainly make no profit. The record clearly establishes that Bell expended the approximate sum of $375,000 to relocate its facilities and utilities. This lack of pecuniary interest explodes the theory of negligent representation or negligent misrepresentation. Bell necessarily had to expend monies to complete underground construction of its facilities because of the location and the densities of certain business establishments in the area of South Park High School and because of the ancient oaks. These oaks had been planted in front of the high school which had at one time housed the beginnings of Lamar University. If aerial cables and lines had been used, these lines would require that a very large amount of cutting and trimming of these oaks would have to take place. This would have changed their appearance and reduced their beauty and aesthetic value.

Mr. Braxton, the sole owner of the stock of Excavators, testified that there was underground construction and work being performed by and for Bell through subcontrac-

tors. Braxton agreed that in certain instances Bell could not go forward with its work because it was waiting on Cable to complete its relocation work. Braxton had conceded in his deposition and had stated that the margin of profit on a project like this one would run from 20 to 25 percent. We find in the record:

Q. Okay. As a matter of fact—and when you told us 20 to 25 percent, you said it could run that high if everything worked properly. So, that means under a pretty much perfect set of circumstances you might anticipate making as much as 20 to 25 percent. Is that right?

A. Yes, ma'am.

Q. Okay. And less than perfect circumstances, which is your normal project, would be 15 to 20 percent?

A. Yes, ma'am.

But on this project, Schwartzkopf testified to and the jury awarded damages which would increase the amount of profit to 40 to 41 percent.

A defendant's expert testified thusly:

Q. Okay. Now, if I understand this, Excavators & Constructors' claim is essentially that they could have made more money than they bid?

A. Yes, sir.

Q. Could they have made more money than they bid?

A. *They did make more money than they bid.*

Q. The answer is they could and they did?

A. Yes, sir.

Q. Could they have made as much more money as they want?

A. I don't think they could have.

Q. Okay. What would the—have you calculated what the profit would be—what the profit percentage would be for Excavators & Constructors if they were paid what they want, what—the last request—the last—the last quantifications [sic] of their claim?

A. Yes, sir. They would be making a 46 percent profit on this job.

We must stress that some of the delay and some of the downtime days resulted from Hurricane Bonnie. This was in the original claim of Excavators. Hurricane Bonnie was a major storm. We find in the record:

Q. Hurricane Bonnie included in the claim?

A. Yes.

Q. Is it proper for a contractor like Excavators & Constructors to claim delay damages against a utility company or against anyone else for a workday on downtime when the weather prevents it?

A. No, sir, that's not proper.

This record glaringly demonstrates that Excavators knew that it would encounter inevitable and unavoidable delays since Excavators commenced its work prior to the relocation of the utilities and the water meters and the other facilities. Excavators, at their own option, necessarily chose to encounter these delays under their plan of work. In addition, Excavators failed to prepare and failed to distribute a schedule of work until late August or early September of 1986. Such schedule of work was contractually to be prepared by the time of the preconstruction meeting or certainly by May of 1986.

We do not agree with the appraisal and testimony of one witness relating to Jerry Braxton. The record reflects:

Q. With this schedule that they had in mind was there any on the side friction between Jery [sic] and Earl and Richard Faust as to this schedule that they had in mind?

A. Not—no, not as I know Jerry Braxton and Earl Cooper, no.

Q. I don't quote [sic] understand what you mean. Would you explain?

A. Jerry Braxton, bless his heart, would complain about the sun coming up in the morning from the east. I don't mean to be smart about that, but this is just Jerry Braxton, and he will complain about anything. And I'm sure he—probably he complained about me when I wasn't there.

And we certainly have not approached the review of the record in this appeal with any such idea.

Another witness testified concerning the complaints of Braxton:

Q. Well, when Jerry did complain on the Highland Avenue project what did he complain about?

A. He complained about utility locations. He complained about the weather. He complained about a lot of—

Q. (Interrupting) Let me stop there. I want to be sure that we—why does the contractor complain about the weather? They don't like much, do they?

A. No, sir.

Q. Is that what you're talking about?

A. Yes, sir.

Q. Anything else?

A. He—just during the course of the project there are things that come up that, you know, underground obstacles, just, you know, things, general things.

Under the "no damage for delay" defense, it is noteworthy that the president of Excavators complained about underground obstacles. A question posed by Excavators' counsel revealed that Excavators took the position that six months was a reasonable time for Bell to complete its work. As we have pointed out above, Bell virtually accomplished this with the exception of a very few poles, the presence of which was explained. In fact, at a place in the record, Excavators desired six months to complete its work; but at another place Excavators stated it could have completed its work in 11 to 12 weeks. We see nothing in the basic contract that gives the right to Excavators to complete the excavations in 11 weeks. Nor does the contract require the City or Bell to comply with the 11 weeks estimate.

Excavators argued, however, that Bell should have started its work in August of 1985; but, as we read the record, the Highland Avenue project had been put on hold because of a great loss of money by the City. We decide there was no duty or obligation on Bell to start its work nine months before the very first preconstruction meeting.

Significantly, the record shows that there were obstacles involving underground utilities and that these obstacles caused delay in the excavation surface work. The City had

lost funding to the extent of, according to one report, over $17,000,000. Fortunately, at a much later date, the City recouped most of this loss. The statement of facts and the documentary evidence vividly demonstrate that the relocation of the above ground utilities were to be coordinated through the combined efforts of Fittz and the City and for that reason a full hearing on the indemnity question is made necessary inasmuch as the City had additional and different onerous duties and obligations while Bell had no duty or obligation to coordinate the progress of the work. A professional engineer, Richard Faust, employed by Fittz gave this evidence when solicited by Mr. Scott, counsel for Excavators:

Q. So there weren't going to be any Gulf States in the way going up the west side of the street or at least the first half of the project, were there?

A. That's true.

Q. Do you have any criticism or complaint about Gulf States? Do you think Gulf States delayed excavating or Excavators on this project?

A. I believe Excavators was delayed. I have no—I can't make a statement as to who did the most, who did the least.

Q. Okay.

A. I know in my dealings with Southwestern Bell, if I called up and asked them to do so something [sic], I felt like they were pretty responsive.

This same professional engineer swore that: "[b]ut under general note eleven, as I just read, that he [Excavators] should have taken into account in his bid any cost problems that came about as a result of the relocation of utilities." The record demonstrates that on October 28, 1986, the next to last Bell pole was pulled and removed. Underground construction and work and underground operations, improvements, and obstacles involved numerous changes—all being an integral part of the basic contract. These factors implicated the "no damage for delay" clause. Braxton took the definite position that it was the duty of the City to see to it that the utilities were removed and to implement their relocations timely and properly. The

delays and the resulting confluent damages, if any, we conclude that were related to the underground construction, were, in turn, so closely intertwined and intermingled with the surface work that the "no damage for delay" clause is infused into the contract and the Highland Avenue project. As a specific example clearly set forth in the evidence, it should be noted that underground construction had to be extended because of a large underground storm or sanitary sewer pipe made out of concrete that was encountered unexpectedly by Excavators. The same had not been shown on any plat. This obstruction was not discovered until it was encountered; but it had to be removed in order to do other work.

### Charley Adams' Testimony

Mr. Adams' sworn statements in the record are clear and unequivocal. He stated the City crews had to work on certain repairs as well as moving the meters and that Excavators itself had made mistakes and engaged in wrong procedures; and hence, Excavators was improperly attempting to profit from its own negligences and its own wrongful acts. Adams' important testimony could be discussed further, but the length of this opinion prohibits same. His testimony was to the effect that underground construction had to be put in and installed before reasphalting work could commence. We conclude that the underground construction was so related to the other work that the concurrent damages resulting therefrom were intertwined and intermixed, triggering the "no damage for delay" clause. Excavators made no attempt to distinguish and separate the damages or the elements of damage.

### Michael K. Birchfield's Evidence

Birchfield was a construction superintendent or foreman. He also acted as a construction supervisor. He was the employee of Cable. The main thrust of his evidence was that Fittz had never furnished him or his company with any plans and that these professional engineers had failed to coordinate the work on the job. His cogent testimony certainly raised the issue that Fittz had caused delay damages. Nevertheless, Fittz obtained an instructed verdict. And this part of Birchfield's testimony was developed by counsel for Excavators. Cable owned no utility poles; it rented poles from GSU or Bell. Birchfield was not invited to attend and did not attend the preconstruction meeting; he received no notice. He dogmatically charged that Fittz failed to do any coordinating of the work in relationship to the Cable company.

Scheduling plans and engineering plans were needed. These matters needed to be carefully prepared and furnished to Cable so that Cable could have a starting date and a finishing date. These plans would inform Cable as to what and when it should order materials and equipment in order to do its part of the work. The City did not furnish the plans; nor did the professional engineers furnish the plans; nor did Excavators. Cable simply could not properly perform its tasks and duties without these essential materials. Problems arose concerning the splicing and reconnecting of cables and lines. Splicing and reconnecting caused the loss of many DBS which in turn caused signal loss and reduced the picture quality to the retail television viewers. This witness, Birchfield, further testified that there was no reason why anybody from Bell should call Cable to give Cable an update of the status or the progress of the work.

Undoubtedly, Excavators wanted to make an additional $230,000 profit on this job. One expert delivered the opinion that if Excavators had bid an additional $300,000 on the job and still had been able to obtain the contract; then and only then, could Excavators have made the additional amount of $230,000 that it was asking from the jury. This expert, a Mr. Roy, was asked this question:

Q. Is it a fair statement to make or to say that if you don't have a schedule that tells the City or tells the City's engineer when you're going to be working and where on a given time and day—would it be difficult at best to coordinate the relocation of the utilities to conform to the engineer's expected schedule?

A. I don't think it could be done.

Q. Would you say it's impossible?

A. Yes.

### President Jerry Braxton and Excavators Absolve Bell

Q. Okay. And let me ask you this. I understand that y'all supposedly had the schedule back in April, this bar chart. The contract told you you had to give the City and Fittz & Shipman a schedule. You were asked for schedule at the preconstruction meeting but you didn't give it to anyone and you didn't think you had any obligation to do that. Is that right?

A. It would have been of no use.

Q. You didn't think you had any obligation to do that?

A. I didn't say that. I just said it would have been of no use.

Q. Did you think you had any obligation to coordinate relocation of utilities on this project?

A. That was not our job.

Q. You didn't have any obligation to do that?

A. That was supposed to have been done prior to.

Q. You didn't have any obligation to go out and talk to folks from GSU or Southwestern Bell. Someone else was supposed to do that for you. Is that what you're telling us?

A. It was supposed to have been taken care of, ma'am.

Q. And yet you think Southwestern Bell had an obligation to Excavators & Constructors to go out and do their work in accordance with your schedule?

A. Not—

Q. And at their cost?

A. An obligation to the City, ma'am, not to me.

Q. All right. Well, the City's not suing them here. You are, aren't you?

MR. SCOTT: Your Honor, I object to that. That's not true. The City is suing them here. That's absolutely not true, and I think that needs to be straightened out.

THE COURT: Sustained. There's a cross action.

BY MS. OLESEN:

Q. The City is not suing Southwestern Bell in this lawsuit for failure to timely remove their telephone poles, are they, sir?

MR. SCOTT: Your Honor, that's the same question. There's a cross action pending. They've sued Southwestern Bell.

MS. OLESEN: It's not for failure to timely remove telephone poles, Your Honor.

THE COURT: It's for indemnity, but I think I'll still sustain the objection. There is a cross action that's related to that.

MS. OLESEN: All right.

BY MS. OLESEN:

Q. They [Bell] didn't have any obligation to you, did they, sir?

A. No, ma'am, they [Bell] didn't.

Q. You didn't have a contract with them [Bell]?

A. That's right.

Q. You didn't pay them [Bell] to remove those poles?

A. No, ma'am.

Q. They do it at their own expense?

A. Yes, ma'am.

### Jerry Braxton Exonerates the City

The City Water Department superintendent testified that no complaint was made against the City in relationship to the moving of the water meters. Mr. Braxton, in the record, swore:

Q. And he indicated you didn't complain to him about his not moving the meters fast enough or his crews not moving them fast enough. Is that correct?

A. That's right.

Q. You didn't complain?

A. The water department [City] didn't know that they had to move the meters until they were out there.

Q. My point was: Did you or did you not complain to him?

A. I did not complain to him. I complained to somebody else.

Q. He [City superintendent] was there every day.

A. And we helped him every day, too.

Q. And he was the guy there to complain to relative to the meters, wasn't he?

A. That's right.

Q. As a matter of fact, your prior testimony indicated that the City water department was prompt in the relocation of their meters; isn't that correct?

A. That's right.

Q. They tried as best they could to stay ahead of you and get those meters out of your way?

A. They sure did, and we helped them.

This opinion is admittedly long—too long. Before the criticizing person throws the first stone, let him or her read this record comprised of 17 heavy volumes of statement of facts, five volumes of transcripts, and a legion of exhibits. The opinion is justified, however, in order to address the dispositive points of error. Some of these points of error were overlapping and somewhat repetitious. Also, since we have set aside certain jury findings, it became necessary for us to heed *Pool v. Ford Motor Co., supra. Pool* requires detailing the evidence.

The district court judgment makes the finding and recites that the defendants Gulf States Utilities, Inc., and Liberty T.V. Cable, Inc. had previously settled with the plaintiff before the date of that judgment. Thus, the $230,721 figure includes some double damages.

We realize that some of the language in the franchise ordinance is loose and ambiguous. We also find the crucial jury finding of the $230,721 to be, as an alternative finding, against the great weight and preponderance of the evidence so as to be clearly wrong and manifestly unjust. In doing so we applied the accepted standards of appellate review.

If the Supreme Court under their Rules 170 and 180 merely reverses our judgment and without hearing argument simply remands the case to the district court, it is our opinion and our judgment that Excavators can proceed against Bell only on the issue of negligence and none other. Excavators cannot retry its theories of promissory estoppel

and negligent representation or negligent misrepresentation unless allowed by the Supreme Court. Of course, if the Supreme Court, either with or without argument, directs that the remand be fashioned in a different mode, then the Supreme Court orders will, of course, prevail. In this interesting and challenging and enticing appeal, we, with great earnestness, invite the Supreme Court's review of our opinion. Excavators can retry only breach of contract issues against the City provided the Supreme Court orders a remand. We do not.

We could have and maybe should have discussed other important matters and the evidence of other witnesses and other documents. We feel that these other evidentiary matters infuse rightness into our opinion and judgment.

*We reverse the judgment and render judgment that Excavators take nothing of and from the City—and that Excavators take nothing of and from Bell.*

REVERSED AND RENDERED.

BURGESS, J., dissents.

BURGESS, Justice, dissenting.

I respectfully dissent. The author of the majority opinion correctly stated in *Highlands Ins. Co. v. Youngblood*, 820 S.W.2d 242, 246 (Tex.App.—Beaumont 1991, writ denied): "[W]e are obligated to uphold the jury's verdict if there is any evidence of probative value to support the same," yet overturns the unanimous verdict of this jury. I disagree with the majority on many issues and, of course, their ultimate disposition. I will, however, limit this dissent to the more salient points.

### The 220/240 Day Completion Clause

The 220 day substantial completion period or the 240 day final completion period was a contract provision designed to protect the City of Beaumont. It was the maximum time allowed Excavators before the imposition of liquidated damages. Yet the majority treats it as some type of insulation from being liable for damages caused by delay. Furthermore, the majority states nothing in

the contract authorizes Excavators to accelerate the work on the project. This is viewing the clause from the wrong perspective. There is nothing in the contract to prevent Excavators from accelerating the work. The majority would penalize a company for efficiency and even taking advantage of favorable weather. The majority even notes "Excavators was assessed no penalty or other types of damages for untimely completion." The "untimely completion" was early completion.

### The No Damages for Delay Clause

In the absence of some clear and unambiguous contractual provision to the contrary, a contractor is entitled to recover damages from a contractee for losses due to delay and hindrance of work if it proves the work was delayed or hindered, it suffered damages because of the delay or hindrance and the contractee was responsible for the acts or omissions which caused the delay or hindrance. *City of Houston v. R.F. Ball Const. Co., Inc.,* 570 S.W.2d 75, 77 (Tex.Civ.App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Shintech, Inc. v. Group Constructors, Inc.,* 688 S.W.2d 144, 148 (Tex.App.—Houston [14th Dist.] 1985, no writ). The majority holds the "no damages for delay" clause in this contract applied to the entire contract and not just to the underground construction provisions. This clause, as noted by the majority, is item 600.07 of the contract. This is a subset of item 600 which begins the specifications for underground construction. Excavators did not claim any delay nor damages connected with the underground construction. Excavators' claims involved the excavating and paving of the roadway. This clause is inapplicable to the controversy.

### Southwestern Bell's Duty

The majority holds Bell made no representations to Excavators and could not anticipate that Excavators would rely upon "the timing or sequencing utterances made by Bell at the preconstruction meeting," in other words, Bell could not reasonably foresee any reliance or risk of harm. The evidence, in my judgment, does not support the majority's position. The following portion of testimony from Bell's representative, Scott Dillard, is illustrative:

Q. Did you also make some representations at the April 17 meeting concerning the phases of Southwestern's work, how you had it sequenced?

A. I believe I did, yes, sir.

In a case where the facts are almost identical to this case, *Southwestern Bell Telephone Company v. Meader Construction Co.,* 574 S.W.2d 839, 842–843 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.), the legal duty was recognized. Here the jury answered all the fact requirements necessary to impose the duty upon Bell. Those answers are supported by the evidence.

### Promissory Estoppel

Clearly promissory estoppel is available to Excavators. *See Westech Engineering, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 204 (Tex.App.—Austin 1992, no writ). The majority acknowledges the RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981), deals directly with promissory estoppel. This section of the Restatement has been adopted by Texas courts. *See First State Bank in Archer City v. Schwarz Co.,* 687 S.W.2d 453, 455 (Tex.App.—Dallas 1985, writ ref'd n.r.e.), and *Traco, Inc. v. Arrow Glass Co., Inc.,* 814 S.W.2d 186, 190 (Tex.App.—San Antonio 1991, writ denied). The majority finds, as a matter of law, there were no promises or representations made by Southwestern Bell. This finding is in direct contradiction to the jury's findings. Once again, there is evidence to support the jury's findings and this court should not substitute its judgment for that of the jury.

### Negligent Misrepresentation

Obviously this cause of action rises or falls upon the issue of misrepresentations by Southwestern Bell. The jury so found; the majority disregards.

### The Damages

Excavators' expert testified to the amount of damages. The jury was asked what amount of damage was caused by the City of Beaumont and Southwestern Bell and answered the question. Yet the majority disre-

gards this jury's answer because the majority apparently believes a portion of Excavators' damages were caused by other parties. That was for the jury to decide. Their decision is supported by the evidence and should stand. Assuming the jury's answer is incorrect, this is factual insufficiency and would result only in a remand, not a rendition.

To repeat, I find both a legal basis for recovery and sufficient evidence in the record to support the jury's findings and the trial court's judgment. I would affirm in all respects.