TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00655-CV






Austin Traffic Signal Construction Co., L.P., d/b/a ATS Electrical Contractors;

Cajun Constructors, Inc.; Liberty Mutual Insurance Company;

and Fidelity and Guaranty Insurance Underwriters, Inc., Appellants


v.


Transdyn Controls, Inc., Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. D-1-GN-02-002371, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 This case involves a contract between an equipment supplier and an electrical
subcontractor on a City of Austin construction project. Transdyn Controls, the equipment supplier,
sued subcontractor Austin Traffic Signal Construction Co., L.P. ("ATS") for failing to pay for the
equipment Transdyn had supplied for the construction project. Transdyn also sued Cajun
Constructors, Inc., Liberty Mutual Insurance Company, and Fidelity and Guaranty Insurance
Underwriters, Inc., alleging that they were responsible for Transdyn's damages because they had
provided payment bonds on the project. ATS filed a counterclaim against Transdyn, asserting that
Transdyn had breached the parties' equipment-supply contract by providing defective equipment and
by failing to complete other obligations under the parties' contract. After a bench trial, the trial court
rendered judgment in favor of Transdyn. In six issues, ATS asserts that the trial court erred by
(1) admitting certain witness testimony into evidence, (2) failing to award ATS an offset for training
fees it had incurred as a result of Transdyn's breach, and (3) awarding "incidental delay damages"
to Transdyn. We affirm the trial court's judgment.


BACKGROUND

 In September 2000, the City of Austin entered into a construction contract with Cajun
Contractors, as general contractor, to build the Walnut Creek Wastewater Treatment Plant in Austin
("Walnut Creek project"). (1) Cajun, in turn, entered into a $3.7 million subcontract with ATS to
provide the electrical and instrumentation work on the Walnut Creek project. ATS's scope of work
under its subcontract included providing "all labor, materials, and equipment to design, furnish,
install, calibrate, test, adjust, and place in operation the facility monitoring and control
system"--also known as the process instrumentation and control system ("PICS"). PICS includes
the sensors and instruments used to monitor and control the facility and permit remote access and
control of those sensors and instruments.

 Although ATS was responsible for PICS under its subcontract with Cajun, the
specifications for the Walnut Creek project required that the City of Austin approve the PICS
supplier and installer. ATS asked Transdyn, one of four city-qualified PICS suppliers, to submit a
proposal to supply the PICS for the Walnut Creek project. ATS told Transdyn, and the project
specifications provided, that the Walnut Creek project was scheduled to be completed 360 days after
construction began. Transdyn's representative also testified that ATS's representative told Transdyn
that ATS's PICS budget was $1,000,000. ATS also sent Transdyn the project specifications
covering PICS.

 Based on all the information it had received from ATS, Transdyn submitted a
$1,000,000 proposal "for furnishing, but not installing, portions of the [PICS] for the subject project
as defined in [the sections of the project plans and specifications ATS] provided." The proposal also
specified that Transdyn would provide certain training. The PICS section of the project plans, which
were incorporated by reference into the proposal, included the following payment terms for the PICS
part of the project:


Partial Payment Limits:


 A. Partial payments for Work required under PICS Subsystems is shown as a
percent of Lump Sum Item amount:


 1. Submittals, not including PICS O&M manuals, 15 percent
maximum,


 2. Performance Acceptance Tests PAT, 20 percent, minimum.


 3. Reliability Acceptance Tests RAT, 20 percent, minimum.


 4. PICS O&M manuals, 5 percent, minimum.



(Emphasis in original). Transdyn's proposal stated that payment would be according to "mutually
agreeable payment terms resulting in neutral cash flow for the project." (2) ATS accepted Transdyn's
proposal and authorized Transdyn to begin work on the project on September 14, 2000.

 Approximately two months after construction began on the Walnut Creek project,
Transdyn, ATS, and Cajun agreed on the following payment schedule for Transdyn's work:


As agreed upon at our partnering meeting, the following table is Transdyn's revised
Milestone/Payment Schedule. Note that the payment dates are the estimated dates
for payment of the invoice and are approximately one month after the issuing of the
invoice.



 Cont.

 Milestone Payments Amt: $1,000,000 % Retained 5%





Milestone %

Payment
Less

Retainage
Expected
Pay Date
Acceptance of
Schedule/Schedule of
Values/Hardware List

5%

$50,000.00

 

$47,500.00

Oct-00
Hardware Submittal
Approval
10%
$100,000.00
$95,000.00
May-01
Hardware Shipped to
Staging
40%
$400,000.00
$380,000.00
Jan-01
Performance
Acceptance Tests
Complete

20%

$200,000.00

$190,000.00

Aug-01
Reliability
Acceptance Tests
Complete

20%

$200,000.00

$190,000.00

Sep-01
O&M Manual
Approved
5%
$50,000.00
$47,500.00
Sep.-01
Final Payment

$50,000.00
$50,000.00
Sep.-01

100%

$1,000,000.00




(hereinafter,"milestone payment schedule"). Transdyn's representative testified that the purpose of
this agreement was to achieve the "mutually agreeable payment terms resulting in neutral cash flow"
described in Transdyn's original proposal by requiring ATS to pay Transdyn approximately one
month after receiving Transdyn's invoice for each milestone. ATS's representative testified that this
agreement meant that Transdyn would be paid a certain amount after each milestone was reached
and final payment after the last milestone was reached, rather than by a date certain or invoice date.

 In addition to modifying the contract's payment terms, ATS and Transdyn also later
agreed to modify the training provisions of their contract. This modification resulted from requests
by the project engineers that Transdyn make certain design changes to the PICS. Transdyn notified
ATS that making the requested changes would require a change-order and an increase of $11,375.61
to the parties' contract. After negotiations, the parties agreed to incorporate the changes into the
existing contract at no extra charge to ATS and, in exchange, release Transdyn from some of its
obligation to provide post-installation training.

 Transdyn made the requested changes to the PICS system, but when PICS was
installed and ATS requested a week of training from Transdyn, the parties realized there was a
misunderstanding about the modification. Transdyn contends that it had agreed to perform the
change-order work--valued at $11,375--in exchange for a release from its entire three-week training
commitment--valued by Transdyn at $12,000. ATS contends that it only agreed to release Transdyn
from two of the three weeks of training and that Transdyn was still required to provide one week of
training. Because the parties could not resolve this matter during construction and because ATS was
under construction deadlines, ATS provided all three weeks of the training.

 There were other problems between Transdyn and ATS on the Walnut Creek project,
the most significant of which was a delay in completion of the project. The project was originally
scheduled to finish by September 2001, but it was not ready until June 2002. This was due, in part,
to the fact that Austin experienced unusually heavy rainfall in the autumn of 2000 and, in part, to
problems caused by the project engineer, the general contractor, other subcontractors, and either
Transdyn or ATS, depending on the party testifying. The end result for Transdyn was that it had to
wait on the delays to complete its portion of the contract and it did not receive its final, and largest,
payment in September 2001 when the project was expected to be complete. Transdyn also
complained that ATS did not pay Transdyn's initial invoices in a timely manner.

 ATS, however, argued it was not responsible for the delay and, in fact, that Transdyn
itself was responsible for delays. Specifically, ATS contends that the engineers and other contractors
had to delay testing the PICS because Transdyn had ordered its engineer, without whom testing could
not occur, to leave Austin right before PICS testing. ATS also contends that Transdyn was
responsible for the numerous PICS problems and defects discovered during testing and that these
defects had to be repaired before the project could continue. Transdyn contends that, despite all the
delays on the project, it had shipped the PICS equipment according to the terms of the parties'
agreement and had PICS ready to be installed, started, and tested in September 2001, which was the
original completion date for the construction project and the final payment date on the parties'
payment schedule.

 Because of the delays and problems with payment throughout the project, Transdyn
sent ATS demands for payments and asked for assurances about the delays. On January 7, 2002,
while the project was still ongoing and the PICS was still not complete, but after Transdyn states it
had completed 95% of its work, Transdyn submitted its final invoice for the project and demanded
the remainder due under the entire contract--$477,500. When ATS did not pay, Transdyn filed this
suit, alleging breach of contract by ATS and seeking damages and attorney's fees. ATS
counterclaimed for breach of contract as well, alleging that Transdyn had failed to complete its work
and had failed to provide the agreed-upon one week of training per the parties' oral modification.

 After a bench trial, the trial court found that ATS had materially breached the contract
by not paying Transdyn according to the terms of the contract and awarded Transdyn its damages,
including incidental damages, and attorney's fees. The trial court also found that Transdyn had
breached the contract by failing to perform terminations and repairs on the PICS, and awarded ATS
its damages and attorney's fees for that breach. After the offsets for Transdyn's breach were
credited, the trial court awarded Transdyn $82,403 in damages, plus pre-judgment interest of
$28,451.36, $50,000 in attorney's fees, and $9,619 in court costs. ATS appeals.


DISCUSSION

 In six issues on appeal, ATS contends that the trial court erred by (1) admitting certain
testimony by Transdyn's corporate representative, Brian Luiz, (2) failing to credit ATS with an offset
for training costs incurred because of Transdyn's breach of contract, and (3) awarding Transdyn
"incidental delay damages."


Testimony of Brian Luiz

 In its first issue, ATS contends that the trial court erred in admitting, over objection,
Brian Luiz's testimony about the change-order request and agreed modification to the training
requirement in the parties' contract. ATS objected to Luiz's testimony on the grounds that it was
inadmissible hearsay and that Luiz had no personal knowledge of the change-order or the parties'
modification negotiations. ATS objected to the following testimony by Brian Luiz:


Q: [Transdyn's Counsel] Are you familiar with this Change Order dispute I
described to the Judge in my opening statement?


A: I am.

 

Q: Will you please convey, in your own words to Judge Livingston, what
Transdyn[]'s position is with regards to the Change Order components of this
litigation?


ATS's counsel: Excuse me, Your Honor, I'm going to object to any testimony
from this witness until it's proven that he has first-hand
knowledge of this, because I think the discovery shows he
was not involved in the first hand--on a first-hand basis with
respect to the negotiation of this alleged Change Order.


The Court: Establish what personal knowledge, if any, he has or what
other knowledge he might have.


Transdyn's counsel: Sure, Your Honor. And he's our corporate representative. 
We're just asking him to say what this--what we've pled,
what this company's position is with regards to it. Not
anything that he hasn't--doesn't have direct knowledge of.


The Court: Okay.


ATS's Counsel: Okay.


Q: [By Transdyn's Counsel] Okay. Mr. [Luiz], were you involved with your
employees and personnel in discussing the Change Order disputes while the
project was on-going?


A: I was.


Q: Okay. Did you ever have any discussions with anyone at ATS about the
Change Order dispute?


A: I believe I did.


Q: Okay. Who?


A: Mr. House.


Q: Okay. And who at Transdyn[] did you discuss the Change Order dispute
with?


A: With Mr. Smith and Mr. Maxwell.


Q: Okay. And both of whom work underneath you, correct?


A: That's correct.


Q: Okay. And you testified earlier at some point, you started getting copied on
a lot of the correspondence that we've seen and will be seeing; is that correct?


A: That's correct.


Q: Did any of that correspondence involve this Change Order dispute?


A: The letter I previously reviewed that illustrated the cost of those Change
Orders--of that Change Order was presented to me in a normal course of our
reading file.


Q: Okay. And you--you reviewed it then and familiarized yourself with
Transdyn[]'s position concerning the Change Order dispute?


A: I did.


Q: Okay. What is Plaintiff's Exhibit No. 15?


A: That is the bid summary as prepared on June 22nd 2000 for this project.


Q: Okay. And it itemized and details out what Transdyn[] was going to perform
and how--and what internally it cost or how it tracked the cost of this job,
correct?


A: That's correct.


Transdyn's Counsel: Your Honor, we move to admit Exhibit 15.


ATS's Counsel: No objection, Your Honor.


The Court: It's admitted.


Q: [By Transdyn's Counsel] Can you please convey to the Judge what
Transdyn[]'s position is with regards to the Change Order Dispute?


A: It was my understanding that when we prepared the Change Order, the cost
for that Change Order was $11,000 and some added amount of
money--$11,000 plus.


ATS's Counsel: Excuse me, Your Honor. Objection to this witness testifying
to any--what anybody else told him about the presentation of
the Change Order.


The Court: He hasn't done that yet. So far he just said it's his
understanding that the cost was going to be $11,000.


ATS's Counsel: And I'm entitled to know--he's testified to what his
understanding was. And he said his understanding came from
Maxwell or Smith. The background of this, Your Honor, is
Mr. Smith and Mr. Harutanian had a conversation
heard--overheard by Mr. House. Those are the three parties
that have first-hand knowledge of what this alleged agreement
is. Anything this witness is going to testify about is going to
be hearsay that he got from talking to Smith or somebody
else. He has no first-hand knowledge of this alleged
agreement on this Change Order.


The Court: Well, so far he hasn't related what anybody told him. All he's
saying is he thinks it was $11,000. So far that's okay. He
thinks it was $11,000. You can cross-examine him on that
point. But, please, don't tell us what anybody else told you,
except obviously Mr. House, you can certainly tell us what he
said.


The Witness: Okay.


The Court: Go ahead Mr. Spencer.


Q: [By Transdyn's Counsel] Okay. Again, what is Transdyn[]'s position with
regard--in this litigation with regards to this Change Order?


A: That the $11,000 that was shown on the earlier document of the cost, was the
cost to perform the Change Order. No Change Order was issued on the
project at its conclusion. It was my understanding that that was in exchange
for the PLC, Programmable Logic Controller training on the project, which
we had estimated at $12,000.


ATS's Counsel: Well, may I take him on voir dire?


The Court: No.


ATS's Counsel: Okay. I'm not entitled to know from whom he gained that
understanding?


The Court: When you cross-examine him you can ask him whatever you
want. So far there's no point in you taking him on voir dire. 
It's not different from your cross-examination. Just be
patient, you're going to get to have him and ask him whatever
you want when it's your turn to cross-examine him. You can
voir dire him for the admissibility of the document or
something like that. So far he hasn't said anything that would
justify you interrupting the direct examination about
something--


ATS's Counsel: All right.


Q: [By Transdyn's Counsel] Mr. [Luiz]--


The Court: I'm sorry. I missed the last part. In exchange for what?


The Witness: In exchange for the cost that we had for the PLC training that
is shown on Exhibit 15, down towards the middle of the page
there's a 12,000-dollar cost item there.


The Court: Okay.


Q: [By Transdyn's Counsel] Okay. And how much is--do you recall even
approximately how much ATS is attempting to assert as an offset to our
claim for this--this training--for a part of the training obligation?


A: I thought it was 17,000, but I could be incorrect. But it was more than
the 12,000.


Q: It was more. Okay, does it appear that the amount of the Change Order is
almost the exact--it's 11,000 and some change. Does it appear to be almost
the exact same amount as we had budgeted for this actual training, for all of
the training here, according to Exhibit 15?


A: It does.


Q: Okay. Would--did you ever authorize anybody from Transdyn[] to--to just
partially trade out that--that obligation?


A: I did not.


Q: Would you have?


A: Not at those costs, no.


Q: Okay. Because it doesn't make sense that you would have traded out $8,000
for $11,000. Is that what you're getting at?


ATS's Counsel: Well, Your Honor, that's leading.


The Court: Sustained.


Transdyn's Counsel: Okay.


The Witness: No what--


The Court: Hang on, hang on. He's going to ask you another question.


The Witness: Okay. I'm sorry.


Q: [By Transdyn's Counsel] We estimated the PLC training here, according to
our bid, which predates this whole dispute, we estimated it at $12,000 for all
three weeks; is that correct?


A: That's correct.


Q: Okay. And so if you divide that $12,000 by three, what does that come out
to a week?


A: $4,000 a week.


Q: Okay. And what's your understanding with regards to the dispute as far as
the two versus three weeks? What is--what is their position?


A: I understand their position to be that in exchange for the 11,000-dollar
Change Order, we were only going to provide one week of training and they
were going to delete two weeks of the training.


Q: Okay. And what is Transdyn[]'s position with regards to that?


A: Our position is . . . that we traded all of the training for that.



 We review a trial court's decision to admit or exclude evidence for an abuse of
discretion. In re J.P.B, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when
it acts without regard to any guiding rules or principles. Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985).

 The rules of evidence define hearsay as a "statement, other than one made by the
declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter
asserted." Tex. R. Evid. 801(d). As the trial court observed, the objected-to portion of Luiz's
testimony contains no out-of-court statements--Luiz did not testify about what other people told him
about the modification negotiations. Accordingly, his testimony was not hearsay and the trial court
properly overruled ATS's objection.

 ATS also argues that the objected-to portion of Luiz's testimony was not based on
his personal knowledge as required by Rule 602 of the Texas Rules of Evidence. Under Rule 602,
a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that
the witness has personal knowledge of the matter. Tex. R. Evid. 602. Personal knowledge is
"[k]nowledge gained through firsthand observation or experience, as distinguished from a belief
based on what someone else has said." Black's Law Dictionary 951 (9th ed. 2009). Thus, a witness
can only testify about those matters, facts, or events that he perceived firsthand. See Strickland
Transp. Co. v. Ingram, 403 S.W.2d 192, 195 (Tex. Civ. App.--Texarkana 1966, writ dism'd)
("Perception of fact by the senses of the witness, that is, firsthand knowledge, is a fundamental
qualification of testimonial competency.").

 Luiz testified only about matters that he perceived firsthand as Transdyn's
vice president:



 Transdyn's litigation position regarding the modification;
 His understanding of ATS's position on damages regarding the modification;




 The identity of people with whom he discussed the change order or related
modification;




 The identification, existence, and contents of corporate documents;
 That Transdyn had valued the cost of three weeks of training at $12,000 in its
pre-contract bid summary;




 That $12,000 divided by three weeks equals $4,000 per week;
 That the change order request was for approximately $11,000 worth of work
and that amount was almost equal to the amount Transdyn budgeted for
training in its bid summary; and




 That he had not, and would not have, authorized anyone from Transdyn to
trade $12,000 worth of work for only two weeks of training.




Luiz did not testify about the negotiations leading up to the modification or what was said or agreed
to in those negotiations. Based on our review of this testimony, we conclude that Luiz testified about
matters about which he had personal knowledge. Accordingly, the trial court did not abuse its
discretion in overruling ATS's objection. (3) ATS's first issue is overruled.


Training Modification

 ATS's second issue on appeal also involves the parties' modification to the contract's
training provisions. At trial, ATS argued that the parties agreed to eliminate only two of the three
weeks of training in exchange for the change-order work. Transdyn argued at trial that ATS agreed
to eliminate all three weeks of training. The trial court made no finding regarding the agreed training
modification, nor does the judgment award ATS damages for the training costs. Thus, we may infer
that the trial court found that the parties agreed to eliminate all three weeks of training. See Tex. R.
Civ. P. 299 (omitted elements will be supplied by presumption in support of judgment if supported
by evidence). ATS contends the trial court's finding is in error because there was legally or factually
insufficient evidence that the parties agreed to eliminate all three weeks of Transdyn's PLC training
obligation in exchange for the change-order work.

 We review the evidence supporting the trial court's findings of fact for legal
and factual sufficiency by the same standards applied to a jury verdict. See Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996). For a legal sufficiency challenge, we review the evidence in the
light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could,
and disregarding contrary evidence unless a reasonable factfinder could not. City of Keller v. Wilson,
168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal sufficiency complaint if the record reveals
(1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence
offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes
conclusively the opposite of a vital fact. Id. at 810. More than a scintilla of evidence exists if the
evidence rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).

 In a factual sufficiency challenge, we consider and weigh all of the evidence in the
record, both supporting and against the finding, to decide whether the finding should be set aside. 
See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the judgment
only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the
"sole judge of the credibility of the witnesses and the weight to be given their testimony." 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one
witness, disbelieve others, and resolve inconsistencies in any witness's testimony. Id. at 697.

 Our review of the record indicates the following evidence supporting the trial court's
implied finding that the parties agreed to eliminate all three weeks of training from the contract:



 Transdyn's pre-contract bid summary valuing three weeks of training at
$12,000;

 Luiz's testimony that Transdyn valued three weeks of training at $12,000;

 Transdyn's letter to ATS stating that requested changes to the scope of work
on the project would cost ATS $11,375.61;

 Luiz's testimony that no change-order was issued on the project;

 Transdyn's letter to ATS stating Transdyn's position that it had agreed to the
perform the change-order work in exchange for three weeks of PLC training,
not two; and

 Luiz's testimony that the change-order work was done as a "no cost change"
because Transdyn was trading its costs incurred on the work for the cost it
saved by not having to do the PLC training.



The only evidence contrary to the trial court's implied finding was an ATS employee's testimony
that Transdyn's project manager told him that Transdyn had agreed with the project engineer to trade
two weeks of training in exchange for the change-order work.

 Considering this evidence in the light most favorable to the judgment and indulging
every reasonable inference that would support the trial court's finding, we conclude that a reasonable
and fair-minded person could conclude that the parties agreed to trade three weeks of training in
exchange for $11,375.66 worth of change-order work. Accordingly, the evidence is legally sufficient
to support trial court's implied finding.

 Based on our review of all the evidence, we conclude that the trial court's finding was
not against the great weight and preponderance of the evidence. While there is some evidence to
indicate that Transdyn had agreed to trade two weeks, there is testimony and evidence suggesting
otherwise. It is for the trial court, however, to resolve such conflicts. Id. at 696-97. The court could
have credited the testimony and evidence of the value of the work traded to conclude that the parties
intended to trade three weeks of training for approximately $12,000 of change-order work. 
Accordingly, we conclude that the trial court's finding was supported by factually sufficient
evidence. ATS's second issue is overruled.


Incidental Damages

 ATS's remaining issues on appeal challenge the trial court's award of incidental
damages to Transdyn. The trial court awarded the incidental damages under article 2 of the Texas
Uniform Commercial Code ("UCC"), which the court had previously determined governed the
parties' contract. Under the UCC, a seller of goods can recover its damages, including incidental
damages, "[w]hen the buyer fails to pay the price as it becomes due." Tex. Bus. & Com. Code Ann.
§ 2.709 (West 2009). Incidental damages under the UCC include "any commercially reasonable
charges, expenses or commissions incurred . . . in the transportation, care and custody of goods after
the buyer's breach . . . or otherwise resulting from the breach." Id. § 2.710 (West 2009).

 With respect to its award of damages and incidental damages, the trial court made the
following findings of fact:



 ATS and Transdyn entered into a contract for Transdyn to furnish "labor and
materials related to the control equipment" for the Walnut Creek project;

 "ATS agreed to pay the agreed price and reasonable value for said electrical
control system pursuant to the terms of the . . . [parties' contract]";

 Transdyn furnished the labor and control equipment materials "in accordance
with the contractual requirements";

 Transdyn performed "all conditions, covenants, and promises to be performed
by Transdyn pursuant to the . . . [parties' contract] with ATS except that it
failed to perform the fiber optic terminations and Performance Acceptance
Test . . . related repairs";

 "ATS failed to pay Transdyn pursuant to the [parties' contract]";

 "Transdyn made timely and contractually correct demands for payment . . . .";

 Transdyn is entitled to the "$67,227.00 balance due under the [parties'
contract]"; and

 Transdyn is entitled to "incidental delay damages in the amount
of $65,397.00."




 A. When Payment Became Due Under the UCC

 In its third issue, ATS contends that the trial court erred in awarding incidental
damages because Transdyn offered no evidence or insufficient evidence that ATS failed to pay
Transdyn when payment became due under the terms of the parties' contract. Specifically, ATS
contends that Transdyn failed to produce evidence that payment was due from ATS when Transdyn
submitted its invoice requesting final payment. The parties disagree on when payment was due
under the contract. Before we can determine whether Transdyn produced sufficient evidence that
payment was due, then, we turn to the trial court's finding of when payment was due under the terms
of the parties' contract.

 Both parties agreed that the milestone payment agreement sets forth the parties'
agreement about when Transdyn was to be paid. The parties disagree, however, on the meaning of
that agreement. ATS argued at trial that payments were due under this agreement only after each
milestone had been reached and, thus, final payment was not due until after the final
milestone--approval of the PICS manuals--was achieved. The testimony of both parties' witnesses
established that the last three of the milestones listed in the payment agreement had not been reached
when Transdyn sent its last invoice demanding final payment. Thus, ATS argues it did not owe
the money when Transdyn demanded payment. Transdyn argued at trial that payment was due
thirty days after it issued an invoice and, further, that final payment was due thirty days after the
project was initially scheduled to be finished, or approximately November 30, 2001; thus, when it
submitted its final invoice in January 2002, payment was past due.

 Rather than make an express finding as to when the payment was due under the
milestone payment agreement, the trial court simply found that "ATS failed to pay Transdyn
pursuant to the [parties' contract]" and awarded Transdyn damages based on its contention that
the delay began in November 2001. Nonetheless, because it was established at trial that the last
three milestones had not been reached when Transdyn sent out its final invoice and because the trial
court found that ATS breached the contract, the trial court necessarily found, as was argued by
Transdyn, that final payment was due approximately November 2001. See Tex. R. Civ. P. 299
(omitted elements will be supplied by presumption in support of judgment if supported by evidence). 
The trial court could not have found that, as ATS argued, payment was due upon completion of each
milestone and also have found that ATS was in breach of the contract. Accordingly, we determine
that the trial court impliedly found that final payment was due on approximately November 30, 2001.

 Based on this implied finding and also because ATS does not challenge the trial
court's interpretation of this contract, we review the evidence to determine if it is factually and
legally sufficient to support the trial court's implied finding that ATS did not pay Transdyn in full
by approximately November 30, 2001. Our review of the record indicates the following evidence
supporting the trial court's implied finding:



 January 15, 2002 invoice demanding payment in full;

 January 8, 2002 Transdyn letter to ATS stating that the contract should have
been completed and fully paid by September 2001;

 January 15, 2002 letter from Transdyn's counsel to Cajun, Liberty Mutual
Insurance Co., and Fidelity and Guaranty Insurance Underwriters, notifying
them that ATS owes Transdyn $477,500 for work on Walnut Creek project;

 February 8, 2002 email from City of Austin project manager stating that no
further payments will be made to Transdyn;

 Luiz's testimony that Transdyn was never paid within thirty days from the
invoice date;

 Otis Maxwell's (Transdyn representative) testimony that Transdyn was never
paid within thirty days from the invoice date;

 Bill Driesslein's (ATS's chief financial officer) testimony that ATS paid
Transdyn's invoices up until the time "the difficulties all arose" when
Transdyn "left the job"; and

 Driesslien's testimony that Transdyn was not paid according to the parties'
payment agreement.




Considering this evidence in the light most favorable to the judgment and indulging every reasonable
inference that would support this finding, we conclude that a reasonable and fair-minded person
could conclude that ATS did not pay Transdyn in full by November 30, 2001.

 We also note that ATS's brief on appeal cites to no evidence in the record indicating
that ATS paid Transdyn by the end of November 2001, nor did we find evidence contrary to the
finding. Therefore, we cannot conclude that the trial court's finding that ATS did not pay Transdyn
in full was so against the great weight and preponderance of the evidence that it was clearly wrong
and unjust. See Dow Chem. Co., 46 S.W.3d at 242.

 We hold that the evidence was legally and factually sufficient to support the trial
court's finding that "ATS failed to pay Transdyn pursuant to the [parties'contract]." We overrule
ATS's third point of error.


 B. Overhead Expenses

 In its fourth issue, ATS contends that the trial court erred in awarding incidental
damages because the "incidental delay damages" requested by Transdyn are not recoverable by a
seller under the UCC. Specifically, ATS asserts that overhead costs, which were included in
Transdyn's incidental damages, are unrecoverable consequential damages. (4) Thus, the question we
must answer is whether overhead expenses are recoverable as incidental damages under the UCC.

 ATS argues that overhead costs are not recoverable as incidental damages because
section 2.709 does not specifically provide for the recovery of "reasonable overhead." See Tex. Bus.
& Com. Code Ann. § 2.709. As support, ATS points to section 2.708's inclusion of "reasonable
overhead" as an element of a seller's damages for non-acceptance or repudiation. See id. § 2.708
(West 2009). We are not persuaded by ATS's argument. The fact that overhead expenses are
specifically mentioned in section 2.708 as being a possible component of a seller's profit does not
mean that they cannot be incidental damages recoverable under section 2.709. Instead, we look to
section 2.710's definition of incidental damages to determine what incidental damages can include:


Incidental damages . . . include any commercially reasonable charges, expenses or
commissions incurred in stopping delivery, in the transportation, care and custody of
goods after the buyer's breach, in connection with return or resale of the goods or
otherwise resulting from the breach.



Id. § 2.710. The commentary to section 2.710 adds that the purpose of this section is



[t]o authorize reimbursement of the seller for expenses reasonably incurred by him
as a result of the buyer's breach. The section sets forth the principal normal and
necessary additional elements of damage flowing from the breach but intends to
allow all commercially reasonable expenditures made by the seller.



Id. (emphasis added). Although we have found no cases addressing whether Eichleay-type damages
are incidental damages under the UCC, we conclude that the types of expenses included in overhead
cost calculations--i.e., business expenses, such as rent, utilities, salaries, insurance premiums,
security costs--can fall within the UCC's definition of incidental damages if those costs
were commercially reasonable charges or expenses incurred as a result of the buyer's breach. See
Wagner & Brown, Ltd. v. Sheppard, 282 S.W.3d 419, 425 (Tex. 2008) ("overhead" expenses include
administration, supervision, office services, and warehousing expenses); Strauss v. Continental
Airlines, Inc., 67 S.W.3d 428, 440 n.7 (Tex. App.--Houston [14th Dist.] 2002, no pet.) (overhead
expenses include "office rent, salaries to employees, payroll taxes, and other fixed costs of
doing business"). We overrule ATS's fourth point of error.


 C. Reasonable Certainty of Incidental Damages

 In its fifth issue, ATS asserts that the trial court erred in awarding incidental delay
damages because there was no evidence or insufficient evidence "of the reasonable certainty of such
damages or that such damages were actually incurred." Specifically, ATS contends that, under
Malone v. Carl Kisabeth Co., 726 S.W.2d 188, 192 (Tex. App.--Fort Worth 1987, writ ref'd n.r.e.),
Transdyn had to prove that it paid a third party to store the equipment or that it was foreclosed from
storing other equipment on its own premises.

 We note that Transdyn's incidental damages include more than just its storage
expenses. Nonetheless, assuming without deciding that Malone applies to the facts of this case, the
Malone court declined to award the seller its storage costs as incidental damages because there was
no proof that the seller "suffered any loss by having to pay to have [the product] stored elsewhere
or was foreclosed from storing other [product] on [his] premises due to [the product] occupying
space." Id. Here, Transdyn's witness testified the equipment was "taking up valuable space in our
shop that we would loved to have had to stage other projects." Transdyn's witness also testified that
Transdyn had to maintain a security system for the warehouse, it had to pay insurance for the
warehouse if equipment was in it, and that Transdyn incurred staff expenses relating to the inventory
in the warehouse. Thus, Transdyn met the Malone requirements.

 Regarding its incidental damages, Transdyn's witness also testified that Transdyn
incurred overhead and interest expenses because of the delays caused by ATS. Documents admitted
into evidence, mostly consisting of letters from Transdyn to ATS complaining about the delays,
specifically refer to damages being incurred as a result of the delays. Considering this evidence in
the light most favorable to the judgment and indulging every reasonable inference that would support
the trial court's finding, we conclude that a reasonable and fair-minded person could conclude that
Transdyn incurred expenses as a result of ATS's breach. Accordingly, we hold that the evidence is
legally sufficient to support the trial court's judgment.

 In reviewing all the evidence, we find nothing that controverts the evidence that
Transdyn incurred expenses as a result of the delay. Accordingly, we hold that the evidence is
factually sufficient to support the trial court's conclusion that Transdyn incurred incidental damages. 
ATS's fifth issue is overruled.


 Causes for the Delay

 In its final point of error, ATS asserts the trial court erred in awarding incidental delay
damages because there was no evidence or factually insufficient evidence that Transdyn's delay
damages resulted from ATS's breach or that ATS caused any delays. Our review of the record
indicates the following evidence supporting the trial court's finding that Transdyn incurred incidental
delay damages as a result of ATS's breach of the contract or that ATS caused delays:



 Testimony and handwritten notes of Luiz that ATS representative told him
that the contract would be complete in approximately 360 days;

 September 14, 2000 letter and purchase order from ATS accepting contract
with Transdyn and authorizing Transdyn to proceed with contract;

 October 26, 2000 email from Transdyn to ATS stating that Transdyn is being
affected by delays on the project;

 November 9, 2000 Revised Payment Schedule from ATS indicating that
expected pay date for final payment was September 2001;

 Luiz's testimony that Transdyn expected to be paid within thirty days of
invoice date, but was never paid within thirty days of invoice dates;

 April 16, 2001 letter from Transdyn to ATS requesting payment of past due
invoices and notifying ATS that Transdyn is ready to ship equipment;

 August 7, 2001 letter from Transdyn complaining about delays and damages
caused by the delays;

 Luiz's testimony that Transdyn submitted its work in a timely fashion and
was never cited for delays;

 Luiz's testimony that Transdyn incurred additional costs, including financing
costs, as a result of the delays in the construction project;

 Luiz's testimony that Transdyn was ready to perform on the contract but that
ATS was not ready; specifically that Transdyn had the equipment ready to go
in September 2001, but that it was not started until the early part of 2002;

 October 2, 2001 letter from Transdyn to ATS complaining about schedule
delays, indicating that Transdyn was able to perform according to agreed
schedule, and stating that Transdyn was incurring additional costs as result
of the schedule delays and of not being paid in a timely fashion;

 Luiz's testimony that approval of Transdyn's hardware submittals was
delayed by sixty days;

 November 7, 2001 letter from Transdyn to ATS setting forth the damages
Transdyn was incurring as a result of the delays on the construction project;

 January 8, 2002 letter from Transdyn stating that Transdyn should have been
paid in full by September 2001 and that it had incurred damages as a result
of the delay in payments;

 Luiz's testimony that as of November 7, 2001 Transdyn was waiting on ATS;

 Transdyn exhibit setting forth its Eichleay damages resulting from delays;

 Luiz's testimony that Transdyn's delay damages resulted from 205-day delay
between the contract completion date and the date Transdyn was finally paid;

 Luiz's testimony that, under the terms of the contract, ATS was responsible
for accepting Transdyn's schedule of values and hardware list;

 Luiz's testimony that the specifications for the project warranted that the
project will be completed in 365 days or the owner would assess liquidated
damages against the prime contractor;

 Luiz's testimony that Transdyn was "contracted to build the job in 365 days,
and we were damaged without any compensation for an extension of that";

 Luiz's testimony that Transdyn incurred damages because Transdyn was
required to complete the project in 365 days and had the equipment ready for
delivery in that time frame, but could not ship the equipment because of the
delays on the project;

 Otis Maxwell's testimony regarding ATS delays, including his testimony that
work outside Transdyn's scope of work, which affected Transdyn's ability to
complete its work, was not completed in a timely fashion;

 March 6, 2002 letter from Transdyn to ATS referencing delays and costs
incurred as a result of those delays;

 Cajun's letters to ATS regarding "Notification of Delay to Project Schedule";

 March 22, 2001 "48 Hour Notice of Failure to Perform" from Cajun to ATS; 

 October 15, 2001 letter from Cajun to ATS regarding "Notification of Delay
to Project Schedule" and informing ATS that it was responsible for several
delays to the project;

 October 15, 2001 "48 Hour Notice of Failure to Perform" from Cajun to
ATS;

 Elliot House's testimony that Transdyn had all the equipment to the project
site by September 2001; and

 Elliot House's testimony that Cajun assessed damages against ATS for delays
in the construction project.




Considering this evidence in the light most favorable to the trial court's finding and indulging every
reasonable inference that would support the trial court's finding, we conclude that a reasonable and
fair-minded person would conclude that ATS caused delays and that Transdyn incurred incidental
damages as a result of the delays. Accordingly, we hold that the evidence was legally sufficient to
support the trial court's finding.

 ATS provided the following controverting evidence:



 October 27, 2000 email from ATS to Cajun stating that delay in submittal
approvals were caused by Cajun;

 December 11, 2000 fax from ATS to Wesco complaining about delays in the
approval of submittal requests;

 March 12, 2001 City of Austin project notes for Walnut Creek project
indicating that engineers were responsible for delay in submittal approval;

 March 12, 2001 letter from ATS to Cajun regarding delays caused by rain and
failure to receive submittal approvals;

 October 19, 2001 letter from ATS to Cajun responding to allegations that
ATS delayed the project and complaining that Cajun was responsible for
delays on the project;

 Luiz's testimony that the engineers on the project were responsible for the
hardware submittal approvals;

 October 2, 2001 letter from Transdyn to ATS indicating that Transdyn was
aware that the activities of others were causing ATS to be delayed;

 Luiz's testimony that ATS's representative told him that ATS had difficulty
performing its work on the project due to problems that were out of
ATS's control;

 Luiz's testimony that he was aware that ATS was not the only entity that
could affect when the tests occurred; that the City of Austin, Cajun, the
engineer, other subcontracts, and weather could affect when tests occurred;

 Testimony from Elliot House of ATS that the delays in the project were
caused by excessive rain in the Fall of 2000, other contractors' failure to
complete work that had to be completed before ATS's work, including the
approval of project submittals, Transdyn's failure to assist with the final
testing of its equipment, and defective equipment Transdyn provided; and

 Testimony from Elliot House that he disagreed with Transdyn's contentions
that the engineers were late in approving submittals.




The trial court resolved the conflicts in the evidence in favor of Transdyn by concluding that ATS
caused delays and that Transdyn incurred damages as a result of those delays. Viewing all the
evidence, we conclude the trial court's finding is not "so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust." See Cain, 709 S.W.2d at 176.

 ATS also contends that to recover incidental delay damages Transdyn had to "(1)
identify each action causing a delay; (2) identify the party responsible for this action; (3) locate this
action in the schedule; and (4) identify the impact of the delay." See Rowan Cos. v. Southwest
Tenant Constr., Inc., No. 01-95-01514-CV, 1999 WL 97545, at *4 (Tex. App.--Houston [1st Dist.]
Feb. 18, 1999, no pet.) (mem. op.). We disagree. Rowan is not a UCC case and, thus, does not
address the determination of incidental damages under the UCC. See id. The UCC allows recovery
of incidental damages "resulting from the breach." See Tex. Bus. & Com Code Ann. § 2.710. We
can find no cases interpreting this UCC language to require the elements found in Rowan, and the
cases that interpreted this language have only determined that it requires that the damages have been
incurred prior to the breach; thus, they do not inform our decision here. See James J. White &
Robert S. Summers, Uniform Commercial Code § 7-16(a) (5th ed. 1996).

 ATS also cites to City of Beaumont v. Excavators & Constructors, Inc., 870 S.W.2d
123 (Tex. App.--Beaumont 1993, writ denied), for the proposition that Transdyn has to prove that
ATS was responsible for each act or omission which caused the delay. City of Beaumont is
distinguishable for at least four reasons: (1) it is not a UCC case; (2) it involved a claim for "lost
opportunity" damages incurred when a contractor allegedly was prevented from finishing a contract
before it was due to be completed; (3) the contractor was seeking damages from a defendant that was
not a party to its construction contract; and (4) the contract at issue contained a no-damage-for-delay
clause. Accordingly, we decline to apply City of Beaumont to this case. We overrule ATS's
sixth issue.


CONCLUSION

 Because we conclude that the trial court acted within its discretion in admitting Luiz's
testimony and the evidence was legally and factually sufficient to support the trial court's findings,
we overrule ATS's issues on appeal and affirm the trial court's judgment. (5)


 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear, and Henson

Affirmed

Filed: August 24, 2010
1. The facts recited in this opinion are taken from the testimony and exhibits admitted at trial.
2. Transdyn's representative testified at trial that "neutral cash flow" is "a common term used
in the construction industry to indicate pay as you go . . . so as you incur the costs, you receive
payment for them."
3. Even if the trial court had erred in allowing Luiz's testimony, either because he lacked
personal knowledge or because his testimony included inadmissible hearsay, ATS fails to explain
how that error probably caused the rendition of an improper judgment. To reverse a judgment based
on an error in the admission or exclusion of evidence, the complaining party must show that the error
probably resulted in the rendition of an improper judgment by demonstrating that the judgment turns
on the particular evidence admitted or excluded. Tex. R. App. P. 44.1(a); Interstate Northborough
P'ship v. State, 66 S.W.3d 213, 220 (Tex. 2001).
4. Transdyn used the Eichleay formula to determine its incidental damages. The Eichleay
formula calculates a contractor's unabsorbed home overhead costs attributed to a government-caused
delay in connection with a government construction contract. See Eichleay Corp., ASBCA
No. 5183, 60-2 B.C.A. (CCH) ¶ 2688, aff'd, 61-1 B.C.A. (CCH) ¶ 2894 (1960). "Home office
overhead costs" are the costs incurred by the contractor for maintaining its whole business, thus, they
cannot be attributed to any single contract or job. See id. The Eichleay formula seeks to equitably
allocate the portion of the home office overhead costs allocable to a particular contract. Id.; see also
Chilton Ins. Co. v. Pate & Pate Enters., Inc., 930 S.W.2d 877, 892 n.10 (Tex. App.--San Antonio
1996, pet. denied). Thus, Eichleay damages compensate the injured contractor for the "extra" costs
incurred as a result of the delay.
5. Because Chief Justice Law was originally assigned to author this opinion, authoring duties
were reassigned.